BURTON-SUTTON OIL CO., INC. *v.*
COMMISSIONER OF INTERNAL REVENUE.

No. 361.   Argued March 25, 28, 1946.—Decided April 22, 1946.

---

[3] Note 1, *supra.*

*Norman F. Anderson* argued the cause for petitioner. With him on the brief was *Cullen R. Liskow.*

*Solicitor General McGrath, Acting Assistant Attorney General Sewall Key, Helen R. Carloss* and *Hilbert P. Zarky* submitted on brief for respondent.

MR. JUSTICE REED delivered the opinion of the Court.

The taxpayer, the petitioner here, is the operating company for the production of oil from Louisiana lands. The taxpayer acquired a contract from J. G. Sutton, grantee in the contract, that imposed upon the grantee the obligation to develop the oil land. For that purpose the contract transferred to the grantee all oil rights previously obtained by S. W. Sweeney by a lease from the owners of the land, the Cameron Parish School Board. Through another transaction the grantor in the Sutton contract, the Gulf Refining Company of Louisiana, acquired these rights from Sweeney. An underlying oil royalty was retained by the School Board and an overriding oil royalty by Sweeney. The contract between Gulf and Sutton required the grantee-operator, who is now this taxpayer, to pay to the grantor, Gulf, 50% of the proceeds of the oil produced and sold from the land, deducting from the proceeds certain itemized expenses of the producer. Those expenses are so general in character that it may be said fairly that Gulf was to receive 50% of the net from operations.

The issue here is the correctness of the taxpayer's manner of handling this 50% net from operations, paid to Gulf, in its return for federal income tax for its fiscal years ending during 1936, 1937 and 1938 under the Revenue

Acts of 1934 and 1936. The taxpayer deducted these payments of 50% of net income from its income for each of the years from the oil sold from the property. It claimed that Gulf retained an economic interest in the oil in place to the extent of this 50% payment. The Tax Court upheld the Commissioner's inclusion of an amount equal to these 50% payments in the taxpayer's gross income. They were included by the Commissioner in the income on the theory that the 50% payments represented capital investment by the taxpayer. That is, they were a part of the cost of the lease. 3 T. C. 1187. If this theory is correct, it is proper to add an equivalent sum, as the Commissioner did, to the taxpayer's gross income.[1] The Circuit Court of Appeals affirmed the Tax Court. *Burton-Sutton Oil Co.* v. *Commissioner,* 150 F. 2d 621.

A decision on the category of expenditures to which these 50% disbursements belong affects both the operators who make them and the owners, lessors, vendors, grantors, however they may be classed, who receive them. If they are capital investments to one, they are capital sales to the other. If they are rents or royalties paid out to one, they are rents or royalties received by the other.[2] The decision below conflicts in principle with *Commissioner* v. *Felix Oil Co.,* 144 F. 2d 276. *Kirby Petroleum Co.* v. *Commissioner,* 326 U. S. 599, involved payments of a share of net income by a producer but differs from this case because the lessor there was a landowner who reserved a royalty as well as a share in the net profits. Consequently, we granted certiorari, 327 U. S. 771.

The applicable provisions in the Revenue Acts of 1934 and 1936 and the Regulations thereunder are substan- •

---

[1] The Commissioner and the Tax Court allowed the taxpayer depletion upon its entire income, so adjusted, under § 114 (b).

[2] *Kirby Petroleum Co.* v. *Commissioner,* 326 U. S. 599, 603–605; *Anderson* v. *Helvering,* 310 U. S. 404, 407.

28

tially the same for the two Acts. We insert below those that seem pertinent.[3] The issue of the character of these 50% payments is not settled, however, by the statutes or regulations. These prescribe the federal income tax accounting procedure after a determination that an expendi-

[3] Revenue Act of 1936, Ch. 690, 49 Stat. 1648, 1660, 1686:

"SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:

. . . . .

(m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. . . . In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. . . ."
"SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.
(b) BASIS FOR DEPLETION.—
(3) PERCENTAGE DEPLETION FOR OIL AND GAS WELLS.—In the case of oil and gas wells the allowance for depletion under section 23 (m) shall be 27½ per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. . . ."

Treasury Regulations 94, promulgated under the Revenue Act of 1936:

"ART. 23 (m)–1 [as amended by T. D. 5413, 1944 Cum. Bull. 124]. Depletion of mines, oil and gas wells, other natural deposits, and timber; depreciation of improvements.—

. . . . .

(g) The term 'gross income from the property,' as used in sections 114 (b) (3) and 114 (b) (4) and . . . articles 23 (m)–1 to 23 (m)–28 of Regulations . . . 94 . . . means the following:
In the case of oil and gas wells, 'gross income from the property' as used in section 114 (b) (3) means the amount for which the taxpayer sells the oil and gas in the immediate vicinity of the well. . . .
In all cases there shall be excluded in determining the 'gross income from the property' an amount equal to any rents or royalties which were paid or incurred by the taxpayer in respect of the property and are not otherwise excluded from the 'gross income from the property.' . . ."

ture of an operator is or is not a rent, a royalty or an ordinary business expense, but throw little light on what is a rent or royalty.

In the *Kirby* case, we held that a payment of a share of the net profits from oil production by the operator to the owner of the land was a rent or royalty and taxable to the landowner as income from the oil property. Therefore the owner could take from the payment the 27½ per centum allowance for depletion provided by § 114 (b) (3). The reason given in the *Kirby* case for holding that the payment of a part of the net return from the property to the landowner was a royalty or rent,[4] was that the owner had a capital investment—an economic interest—in the oil with a possibility of profit from that interest or investment solely from the extraction of the oil. As hereinbefore indicated, the landowner in the *Kirby* case had retained also a one-sixth oil royalty and had received a bonus. It was conceded that as both the bonus and the royalty represented a return for the sale in part of the lessor's investment in the oil in place, the lessor was entitled to depletion on both.[5]

The respondent urges that in the *Kirby* case it was the lessor's economic interest in some of the oil itself, or its proceeds, because of the bonus and royalty rights, which made the net profit payments subject to depletion in the

---

[4] A reading of § 114 (b) (3) shows that the "gross income from the property" means income from the oil and gas wells on the property. *Helvering* v. *Twin Bell Syndicate,* 293 U. S. 312; *Helvering* v. *Producers Corp.,* 303 U. S. 376, 382. Other income would not be depletable under that section. "Rents or royalties" in the section are those payable for the privilege of extraction.

[5] *Kirby Petroleum Co.* v. *Commissioner, supra,* pp. 601–602; *Burnet* v. *Harmel,* 287 U. S. 103, 111; *Murphy Oil Co.* v. *Burnet,* 287 U. S. 299, 302.

lessor's hands; that net profits received are not depletable unless the recipient is entitled also to oil royalties.[6]  Consequently, the Government contends that in this case where there is only a share in profits due to the assignor, Gulf, the *Kirby* case conclusion on the right to depletion should not be extended but that the judgment below should be affirmed on the ground that the profit payment was a part of the purchase price.  In dealing with the operator's exclusion from gross income of agreed payments to lessors or assignors of leases out of net profits and with the lessor's or assignor's rights to depletion, the Tax Court has not followed consistently the principle that a reserved royalty is necessary to make a net profit payment depletable to the lessor and deductible from gross income from the property by the operator.[7]  A number of the Tax

---

[6] The principle upon which the Tax Court and the Circuit Court of Appeals decided this case for respondent differs from respondent's present contention.  This principle was that an obligation to pay a part of net proceeds is a personal covenant of the obligor and was the purchase price for the assignment. *Burton-Sutton Oil Co.* v. *Commissioner*, 150 F. 2d 621, 622; 3 T. C. 1187, 1194, relying upon *Quintana Petroleum Co.* v. *Commissioner*, 143 F. 2d 588, 590–91; 44 B. T. A. 624, 627; *Helvering* v. *Elbe Oil Land Co.*, 303 U. S. 372.

[7] In *W. S. Green*, 26 B. T. A. 1017, the lessor was allowed depletion on a net income payment in addition to his royalty on the ground that the net income payment was like a bonus.

In *Marrs McLean*, 41 B. T. A. 565, 573, which was decided after the *Elbe* case, the Tax Court said a transfer of leases for cash and a share of the profits was a sale.  Where only a three-fourths interest in the lease was transferred and the transferor was to have one-fourth of the net profits, depletion was allowed the assignor.

In *Felix Oil Co.*, T. C. Docket No. 107148, decided December 18, 1942, a lessor corporation that had leased its oil lands for a cash payment plus 50% of the net profits as defined in the lease and no royalty, was held to have "retained an interest in the oil in place" through its ownership of the land.  "Clearly, petitioner retained an interest in

Court cases on depletion and deduction cited in the preceding note did involve reserved royalties as well as payments of net profits. The *Felix Oil Company* and *A. B.*

the oil produced because it could compel the lessee to sell 50 percent of the production elsewhere if it became dissatisfied with amounts realized by the lessee." Memorandum op., p. 13. See *Commissioner v. Felix Oil Co.*, 144 F. 2d 277, affirming. Compare *A. B. Innis*, T. C. Docket Nos. 2735–2736, June 29, 1945.

In *Kirby Petroleum Co.*, 2 T. C. 1258, 1261, the Tax Court relied on the latter ruling in *Marrs McLean* and held that the lessor could deplete its net profits payment, as well as its royalty. It later explained this ruling as based on the Kirby Company's retention of a "one-sixth oil royalty, thus reserving to itself an interest in the oil in place." *Estate of Dan A. Japhet*, 3 T. C. 86, 93.

In the *Japhet* case, depletion on net profits from an assignee's operation was denied an assignor of a lease who had received a cash payment but had not reserved a royalty. It was said no "economic interest" was reserved.

In *A. B. Innis*, T. C. Docket Nos. 2735–2736, June 29, 1945, a similar problem arose as to deductibility by gold lease operators from their gross income of a share in net profits paid to the sub-lessor of the lease. The Tax Court found no difference between such a payment to a sub-lessor and one to a lessor. Both were said to have economic interests and therefore depletable rights. *Felix Oil Co., supra*, was followed and *Quintana, supra*, distinguished as a sale by assignment rather than sublease. *Williams Bar Dredging Co.* is in accord. T. C. Docket Nos. 3284, 4074, June 30, 1945.

In *Quintana Petroleum Co.*, 44 B. T. A. 624, an operator-assignee acquired an oil lease by an agreement that called for payment by the assignee to the assignor of one-fourth of the net proceeds from the leased property with no reservation of royalty. The Board concluded that the assignment was a purchase and no deduction of the amount of net profits paid was allowable. See also *Quintana Petroleum Co.* v. *Commissioner*, 143 F. 2d 588.

In *Euleon Jock Gracey*, 5 T. C. 296, 302, decided June 21, 1945, the Tax Court under similar circumstances followed *Quintana* and held an operator-assignee was entitled to depletion on gross production but could not exclude the net profit payment to his assignee from his gross, as the transfer of the lease, in consideration of a net profit payment only, was a sale.

*Innis* did not. We do not agree with the Government that ownership of a royalty or other economic interest in addition to the right to net profits is essential to make the possessor of a right to a share of the net profit the owner of an economic interest in the oil in place. The decision in *Kirby* did not rest on that point.

To let the character of the net profit payments turn wholly on the ownership of a royalty of some sort by the one who received the net profit would make the right to depletion a form of words. No such mechanical application of a national tax act is desirable. Compare *Burnet* v. *Harmel,* 287 U. S. 103, 110–11. This taxpayer's acquisition of Sutton's contract with Gulf places the taxpayer in Sutton's situation as operator of the School Board lease. The School Board and Sweeney, the original parties to the lease, unquestionably have royalties which would compel a determination that net income payments would be subject to depletion if paid to them in addition to their royalties. It does not logically follow, it seems to us, that the mere receipt of the net income payments by different lessors or assignors can change the character of the taxpayer's arrangements from leases to purchases.

It seems generally accepted that it is the owner of a capital investment or economic interest in the oil in place who is entitled to the depletion. *Anderson* v. *Helvering,* 310 U. S. 404, 407; *Euleon Jock Gracey,* 5 T. C. 296, 302; *Kirby Petroleum Co.* v. *Commissioner, supra.* Whether the instrument creating the rights is a lease, a sublease or an assignment has not been deemed significant from the federal tax viewpoint in determining whether or not the taxpayer had an economic interest in the oil in place. *Palmer* v. *Bender,* 287 U. S. 551, 557, 558. Nor has the title to the oil in place been considered by this Court as decisive of the capital investment of the taxpayer in the

oil.[8]  Technical title to the property depleted would ordinarily be required for the application of depletion or depreciation.  It is not material whether the payment to the assignor is in oil or in cash which is the proceeds of the oil, *Helvering* v. *Twin Bell Syndicate,* 293 U. S. 312, 321, nor that some of the payments were in the form of a bonus for the contract.  *Burnet* v. *Harmel,* 287 U. S. 103, 111; *Murphy Oil Co.* v. *Burnet,* 287 U. S. 299, 302.  Congress, however, has recognized the peculiar character of the business of extracting natural resources.[9]  Leases are a method of exploitation of the land for oil and payments under leases are "income to the lessor, like payments of rent."[10]  Receipts from oil sales are gross income to the operator and subject to statutory deductions.  Since lessors as well as lessees and other transferees of the right to exploit the land for oil may retain for themselves through their control over the exploitation of the land valuable benefits arising from and dependent upon the extraction of the oil,[11] Congress provided as early as the Revenue Act

---

[8] 287 U. S. at 557: "The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital."

287 U. S. at 558: "Even though legal ownership of it, in a technical sense, remained in their lessor, they, as lessees, nevertheless acquired an economic interest in it which represented their capital investment and was subject to depletion under the statute." *Lynch* v. *Alworth-Stephens Co.,* 267 U. S. 364; *Burnet* v. *Harmel,* 287 U. S. 103, 109–10; *Bankers Coal Co.* v. *Burnet,* 287 U. S. 308; *Kirby Petroleum Co.* v. *Commissioner, supra,* p. 603.

[9] *Stratton's Independence* v. *Howbert,* 231 U. S. 399, 413–14.

[10] *Burnet* v. *Harmel,* 287 U. S. 103, 107–8.

[11] See *Lynch* v. *Alworth-Stephens Co.,* 267 U. S. 364, 370; *Palmer* v. *Bender,* 287 U. S. 551, 556.

of 1918 [12] for equitable apportionment of the depletion allowance between them to correct what was said to be an existing inequality in the law or its administration.[13]

In the present case, the assignor of the petitioner before assignment had an economic interest in the oil in place through its control over extraction. Under the contract with petitioner, its assignor retained a part of this interest—fifty per cent of net. Like the other holders of such economic interest through royalties, the petitioner looked to the special depletion allowances of § 114 (b) (3) to return whatever capital investment it had. The cost of that investment to the beneficiary of the depletion under § 114 (b) (3) is unimportant. Depletion depends only upon production. It is the lessor's, lessee's or transferee's "possibility of profit" from the use of his rights over production, "dependent solely upon the extraction and sale of

---

[12] 40 Stat. 1057, 1067, 1078, §§ 214 (a) (10), 234 (a) (9).

[13] H. Rep. No. 767, 65th Cong., 2d Sess., September 3, 1918, Deductions (5) and for corporations, Deductions (4).

The inequality referred to under the Revenue Act of 1916, 39 Stat. 759, § 5, Eighth (a), arose from the preferred treatment given the owner over the lessee. See Hearings, House Committee on Ways and Means, 65th Cong., 2d Sess., pp. 455, 516–17, 523–28, 530–31. Regulations 33, Income Tax, promulgated January 2, 1918, Art. 170; Regulations 45, 1920 ed., Income Tax, promulgated January 28, 1921, Art. 201.

The applicable law for allowance of depletion in oil and gas wells appears in § 114 (b) (3). It is identical with I. R. C. § 114 (b) (3). This section is the result of administrative experience with oil and gas depletion. Hearings, Sen. Com. on Finance, 69th Cong., 1st Sess., pp. 177–78; Hearings, House Com. on Ways and Means, 69th Cong., p. 1006. See H. Rep. No. 1, 69th Cong., 1st Sess., December 7, 1925, Discovery Value; § 204 (c) (2), 44 Stat. 16. For discussion see *Helvering* v. *Twin Bell Syndicate*, 293 U. S. 312, and *Kirby Petroleum Co.* v. *Commissioner, supra*, pp. 602, 603. Depletion is now an arbitrary percentage allowance based on production from the wells without regard to cost or value of the property.

the oil," which marks an economic interest in the oil. See *Kirby Petroleum Co.* v. *Commissioner, supra,* page 604. Through retention of certain rights to payments from oil or its proceeds in himself, each of these assignors of partial exploitation rights in oil lands has maintained a capital investment or economic interest in the oil or its proceeds.[14] As the oil is extracted and sold, that economic interest in the oil in place is reduced and the holder or owner of the interest is entitled to his equitable proportion of the depletion as rent or royalty. The operator, of course, may deduct such payments from the gross receipts.

Of course, such a transferor, whether the landowner or any intermediate assignor, may completely divest himself of any interest, economic or otherwise, in the extraction of the oil. As the record shows no reservation of an economic interest by Sutton, the assignee of Gulf and the assignor of petitioner, he appears to have done so in this case. See *Helvering* v. *Elbe Oil Land Co.,* 303 U. S. 372. While, as pointed out above, the payment of proceeds in cash, the form of the instrument of transfer and its effect on the title to the oil under local law are not decisive of the right to participation in depletion under §§ 23 (m) and 114 (b) (3), there must be a determination under federal tax law as to "whether the transferor has made an absolute sale or has retained" such economic interest as we have just described in the preceding paragraph. *Kirby Petroleum Co.* v. *Commissioner, supra,* page 606. We have said that the instrument should be construed as a sale when a large cash payment was made with a reserved payment that could be satisfied by future sales of the transferred property without extraction of the oil. Obviously

---

[14] A participation in net profits disassociated from an economic interest does not enable a recipient of such profits to benefit from depletion. *Helvering* v. *O'Donnell,* 303 U. S. 370.

there could be no depletion without extraction. *Anderson* v. *Helvering,* 310 U. S. 404, 412. On the other hand, we have construed an assignment of oil leases for cash and a deferred payment, "payable out of oil only, if, as and when produced," as the reservation of an economic interest in the oil—not a sale. *Thomas* v. *Perkins,* 301 U. S. 655.

The Government contends that *Helvering* v. *Elbe Oil Land Co.,* 303 U. S. 372, controls this case. The transfer of the leases in *Elbe* was held an absolute sale. There the transfer was for cash, deferred payments in cash, if the assignee did not take advantage of a stipulation for abandonment, and a one-third interest in the net profits of the assignee. It was further provided that Elbe, the assignor after the transfer, should have "no interest in or to said properties," except in the case of an abandonment of the property by the assignee. This provision for the transfer of all interest of the assignor was emphasized as a significant part of the agreement for transfer. The issue upon which this Court passed was the classification of the deferred payments. Were they gross income from the property or receipts from a sale of the leases? These deferred payments were not payable out of oil sales but were payable absolutely, unless there was an abandonment. This Court concluded that the addition of a provision for the payment of a share of net profits did not qualify "in any way the effect of the transaction as an absolute sale." Page 375. In view of what we have said in this and in the *Kirby Petroleum* case as to the economic interest in the oil of a recipient of a share of net profits, the holding of *Elbe* should not be extended to the facts of this agreement.

The assignor, Gulf, in the assignment here involved, required the grantee to drill promptly, to account for production, to pay over fifty per cent of receipts, less agreed

costs and expenses, and to sell the production on defined terms to grantor, if grantor desired to purchase. This last clause did not appear in the Elbe contract. Such a transfer of rights to exploit could not, we think, properly be construed as a sale. It is rather an assignment to the operator, petitioner here, of the right to exploit the property [15] with a reservation in the assignor of an economic interest in the oil.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS dissent.

MR. JUSTICE FRANKFURTER.

The tortuous process by which the result in this case has evidently to be reached by the Court justifies calling attention again to the present unsatisfactory state of tax litigation. It is of course idle to expect that the complexities of our economic life permit revenue measures to be drawn with such simplicity and particularity as to avoid much litigation. But it is not a counsel of perfection to assume that a system of judicial oversight of fiscal administration can be devised sufficiently rational to avoid the unedifying series of cases relating to income from oil operations culminating, for the present at least, in this case. The Court made a brave effort in *Dobson* v. *Commissioner,* 320 U. S. 489, to meet some of the difficulties of the present distribution of judicial authority in tax cases by lodging practical finality in a Tax Court decision unless it invokes a "clear-cut mistake of law." *Id.* at 502. An attempt to give adequate scope to such a doctrine of judicial abstention by dealing with the practicalities of

---

[15] See the discussion of *Felix Oil Co.* in note 7, *supra.*

tax matters instead of relying on the grab-bag concepts of "law" and "fact" as a basis of review has not, however, commended itself to the Court. See *Trust of Bingham* v. *Commissioner*, 325 U. S. 365.

To be sure, even the adoption of this view would not make the Tax Court the Exchequer Court of the country inasmuch as tax litigation can go through the district courts as well as through the Tax Court. It would, however, largely centralize review in the Tax Court of Treasury determinations, assuming that the bulk of tax litigation will continue to find its way to the Tax Court.

It is suggested that the Tax Court makes differentiations from case to case which to the uninitiated look suspiciously like conflicting opinions. But it is impossible to escape nice distinctions in the application of complicated tax legislation. And so far as over-nice distinctions are to be made, I do not see that it helps the administration of law for this Court rather than the Tax Court to make them.

Nothing better illustrates the gossamer lines that have been drawn by this Court in tax cases than the distinction made in the Court's opinion between *Helvering* v. *Elbe Oil Land Co.*, 303 U. S. 372, and this case. To draw such distinctions, which hardly can be held in the mind longer than it takes to state them, does not achieve the attainable certainty that is such a desideratum in tax matters, nor does it make generally for respect of law. Perhaps it is inherent in the scheme which Congress has provided for review of tax litigation that we have such an unsatisfactory series of decisions as those which are sought to be reconciled by the present opinion. If so, then the call for legislation voiced in responsible quarters to reform the situation may well be heeded. See *e. g.*, Griswold, *The Need for a Court of Tax Appeals* (1944) 57 Harv. L. Rev. 1153.