**HUNTINGTON BEACH COMPANY,**
a Corporation,
v.
**The UNITED STATES.**
No. 18–55.

United States Court of Claims.
July 12, 1955.

W. J. McFarland, Beverly Hills, Cal., Sigvald Nielson and Harry R. Horrow, and Pillsbury, Madison & Sutro, San Francisco, Cal., on the brief, for plaintiff.

Hilbert P. Zarky, Washington, D. C., H. Brian Holland, Asst. Atty. Gen., Andrew D. Sharpe, Ellis N. Slack, and Kenneth E. Levin, Washington, D. C., on the brief, for defendant.

Melvin D. Wilson, Los Angeles, Cal., filed a brief for Southwest Exploration Co. as amicus curiae.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiff owned land near the seashore in California. It granted to Southwest Exploration Company the right to come on its land and drill wells slantwise to reach oil deposits which were beneath the adjoining submerged lands owned by the State. As compensation, Southwest agreed to pay the plaintiff 17.75% of Southwest's net profits from the sale of the oil taken from the wells. During the

year 1948 the plaintiff received large sums of money from Southwest under this arrangement. It claimed, but the Commissioner of Internal Revenue denied to it, the right to a depletion deduction on those receipts, under sections 23(m), 53 Stat. 14, and 114(b), 53 Stat. 45, of the Internal Revenue Code of 1939, 26 U.S.C.A. §§ 23(m), 114(b). It paid its corporate income taxes without the benefit of the deduction, and here sues for the refund of $182,802.98 of taxes and interest which it paid, and for interest on that sum as provided by law.

■ When the owner of solid minerals or of oil and gas deposits receives money as a result of the mining or production of these commodities, what he receives is treated, for tax purposes, as income, and not as a return upon the sale of a capital asset. But the income is different from interest or rent in that the production of the income depletes the source from which the income is derived. For this reason the tax statutes permit the receiver of such income to deduct, in his tax return, 27½% of his gross income from the production of oil.

When the oil produced or the income from its production is by the arrangements of the parties, to be divided among two or more persons, the basic reason for the depletion allowance is applicable to each of them in his proper proportion. In the usual arrangement whereby the landowner is to have one-eighth of the oil and the operator is to have seven-eighths, the prospect of each for future receipts is diminished as present receipts are obtained. Section 23(m) of the Internal Revenue Code says that in the case of leases the depletion deductions shall be equitably apportioned between lessor and lessee.

Transactions looking to the production of oil and gas have taken a great variety of forms. The landowner leases, reserving a royalty. The lessee may sublease, reserving a royalty. Or he may "assign" his lease, the assignee promising to pay a consideration only out of oil produced, and measured by the amount of production. These are only simple illustrations of the various forms which such transactions take. The statutes do not specifically provide for the application of the depletion allowance to these various forms of transactions. But the Supreme Court of the United States has decided many cases involving the depletion allowance, and has thereby developed principles helpful in the solution of other cases not covered by that Court's decisions.

■ Southwest Exploration Company, the operator which produced the oil from wells on the plaintiff's land, claimed the depletion deduction on all of the oil income. The plaintiff, at the same time, claimed the deduction on its 17¾% of Southwest's net profits. In order to protect the revenue against the loss which would result if these competing claims to the same deduction were both successful, the Commissioner of Internal Revenue took inconsistent positions and denied the disputed portion of the deduction to both parties. Southwest contested the Commissioner's denial in the Tax Court, and that court held in Southwest Exploration Co. v. Commissioner, 18 T.C. 961, that the plaintiff did not possess a depletable interest and that Southwest was entitled to the deduction on all its gross income from the oil wells during the years 1939 through 1945. The United States Court of Appeals for the Ninth Circuit, in a per curiam opinion affirmed, on the basis of the Tax Court's opinion. Commissioner v. Southwest Exploration Co., 220 F.2d 58. If that decision is correct, the plaintiff cannot prevail in this case. It is not legally permissible for both companies to have the same deduction.

■ The fact that in the instant situation the plaintiff received a share in the net profits from the production of oil, rather than a share of the oil produced regardless of the expense of production, is not a reason to deny the plaintiff a depletion deduction. In Kirby Petroleum Co. v. Commissioner, 326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343, a landowner leased his land for the production of oil and gas in return for a cash bonus,

a fractional royalty and 20% of the net profits realized from the production. The Court held that the lessor was entitled to a depletion deduction on the percentage of net profits payment, as well as on the bonus and the royalty. The Court held that the net profits provision gave the taxpayer an additional economic interest in the oil. The Court, 326 U.S. at page 603, 66 S.Ct. at page 411, said:

"By this is meant only that under his contract he must look to the oil in place as the source of the return of his capital investment. * * * The test of the right to depletion is whether the taxpayer has a capital investment in the oil in place which is necessarily reduced as the oil is extracted."

The Court, 326 U.S. at page 604, 66 S.Ct. at page 411, further said, in explaining why no distinction was to be made between a retained royalty interest in gross production, and in the operator's net profits:

"In both situations the lessors' possibility of return depends upon oil extraction and ends with the exhaustion of the supply. Economic interest does not mean title to the oil in place but the possibility of profit from that economic interest dependent solely upon the extraction and sale of the oil."

In the language from the Kirby Petroleum case first quoted above, the reference to the taxpayer's "capital investment" in the oil in place should be noted. It surely cannot mean that it would make any difference that the land had been bought by the lessor for a song as practically worthless desert land, and with no thought of the possibility that it might be a source of oil. In Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 34, 66 S.Ct. 861, 867, 90 L.Ed. 1062, the Court said:

"The cost of that investment to the beneficiary of the depletion under Section 114(b) (3) is unimportant. * * * Through retention of certain rights to payments from oil or its proceeds in himself,

each of these assignors of partial exploitation rights in oil lands has maintained a capital investment or economic interest in the oil or its proceeds."

It is apparent that in the Supreme Court's view, the economic interest is the essential thing, regardless of what, if anything, it cost to acquire it.

In the Burton-Sutton case, supra, the question was whether one G, who was in a chain of title from the original lessor, but who had in turn transferred his rights to another, who had transferred his rights to an operator under a contract requiring the operator to pay 50% of the profits of the operation to G, was entitled to the depletion deduction. The Government, in arguing against the deduction, urged that the decision in the Kirby Petroleum case, supra, was based on the fact that the taxpayer there had, in addition to his right to a percentage of profits, a right to an oil royalty and a bonus. The Government urged that a right to a percentage of profits, standing alone, should not entitle the taxpayer to the depletion deduction. The Court rejected that argument and said in 328 U.S. at page 32, 66 S.Ct. at page 865:

"We do not agree with the Government that ownership of a royalty or other economic interest in addition to the right to net profits is essential to make the possessor of a right to a share of the net profit the owner of an economic interest in the oil in place. The decision in Kirby did not rest on that point."

We must, then, determine the nature and extent of the plaintiff's economic interest in the oil from which it derived the income here in question. Under the California law, the oil under the State's submerged lands could not be recovered except by drilling in the upland. As a condition precedent to obtaining a lease from the State to drill for oil, an operator had to obtain the consent of the owner of the upland to such drilling. The plaintiff owned the upland. The Government says in its brief, "The plaintiff, is, from a pure legal

viewpoint, a stranger to the oil which is being extracted from the submerged lands." From a legal viewpoint, the plaintiff, because of its ownership of the strategic upland, had a legal right to say to the prospective operator, "You cannot produce oil from these lands of the State unless you pay me 17¾% of your net profits." That would seem to mean that the plaintiff, far from being a stranger, was almost as intimately related to the oil as is the ordinary landowner on whose land vertical drilling may be done. An oil operator does not give strangers a percentage, large or small, of his net profits. In this case the plaintiff was in such a legal and geographical position of control with regard to the oil under the State's submerged lands that it could, and did, in exchange for its consent to the recovery of the oil, require that it be paid 17¾% of the operator's net profits, which, in the single year 1948, brought a payment to the plaintiff of $1,298,222.85.

Suppose A owns land in fee simple. He grants to a golf club an easement to use the surface of the land for a golf course. Oil is discovered in the neighborhood. A grants to C the oil in the land, reserving a royalty. But C cannot drill upon the land, since to do so would be incompatible with the easement of the golf club. The golf club grants to C the right to drill upon the land, in return for a royalty, or a percentage of net profits. Should C or the golf club get the depletion allowance upon the golf club's receipts from this source?

The golf club never owned the oil in place, nor any right to produce it. What it owned was an interest in the surface of the land of such a nature that no one could recover the oil by usual and economical methods without first obtaining from it the right to use the surface for drilling. The discovery of oil in the neighborhood increased the value of its interest in the surface. Under the royalty agreement which it made with the operator, its income from its interest in the land would rise and fall with oil production. As oil was taken out, its

prospects for future income would diminish, because of the depletion of the source of its income.

It would seem that, by any realistic standard, the golf club must be said to have an economic interest in the production of the oil. Its physical and legal relation to the situs of the oil puts it into a position to prevent the production of the oil, or permit its production on prescribed terms. That power gave value to its interest in the land. That value was depleted as the oil was taken out.

We think the plaintiff was in the same situation, with regard to the oil under the water, as with the golf club in our illustration. Its land, being the only available site from which a well could be drilled to reach the oil, was in economic relation to the oil. It could, no doubt, have sold its land for a much higher price, after the discovery of oil which could be recovered only through its land. It chose to make the arrangement whereby its return would depend upon the recovery of oil through wells on its land, and its prospects for future return would diminish as the oil was taken out. In all reality, the plaintiff had an economic interest in the oil. The feature that makes this case unique, the fact that the drilling was done slantwise instead of vertically, is surely immaterial.

The cases in which the Supreme Court has held that the taxpayer claiming the depletion deduction did not have the required economic interest are distinguishable. In Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, 58 S.Ct. 621, 82 L.Ed. 904, the taxpayer, the owner of oil land, sold it for a fixed consideration, part of which was paid at once and the balance payable in succeeding years if the purchaser should not elect to abandon the transaction. In addition, the vendor was to receive one-third of the net profits which the transferee might earn after having been fully reimbursed for its expenditure in the acquisition, development, and operation of the property. The money on which the taxpayer sought the depletion deduction was the fixed sum

payments it had received. The Court held that the money was income from the sale of the oil and gas properties themselves, and not income from the operation of wells on the property.

In Helvering v. O'Donnell, 303 U.S. 370, 58 S.Ct. 619, 82 L.Ed. 903, the Court held that a taxpayer who had transferred shares of corporate stock to an operating company in return for its promise to pay him one-third of the net profits of its oil operations on certain properties, did not have an economic interest entitling him to the depletion deduction. The taxpayer there, unlike the plaintiff in the instant case, had no relation to or control over the production of the oil before he bought and paid for a right to share the profits. He was, factually and legally, a stranger to the oil property.

In Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277, the taxpayer purchased, for a fixed consideration certain royalty interests, fee interests, and oil payments in designated properties. He paid a part of the consideration in cash, and promised to pay, on the balance, one-half of the proceeds of oil and gas produced from the properties, and one-half of his receipts from the sale of the fee properties. During the taxable year, the taxpayer received income from the production of oil and gas, and paid one-half of it over to his vendor. He sought to exclude these payments from his taxable income. The Court held that he could not do so. If the transferor had been entitled to be paid only out of oil and gas production, it would have continued to have an economic interest in the property. But since it was entitled to be paid also from the sale of the fee interests, the transaction was a sale to the vendee taxpayer and the payments which he sought to exclude from his income were payments on the purchase price.

In Helvering v. Bankline Oil Co., 303 U.S. 362, 58 S.Ct. 616, 82 L.Ed. 897, the taxpayer had contracts with oil producers to separate the wet gas from the dry gas as it flowed from the wells, thereby producing casinghead gasoline. The taxpayer was to keep two-thirds of the gasoline and give one-third to the oil producers. It claimed the right to depletion deductions with respect to its income from these contracts. The Court denied the claim. It said that through its contracts the taxpayer obtained an economic advantage from the production of the gas, but that it had no interest in the gas in place. It would seem that the taxpayer in that case was in a situation comparable to one who has a contract to buy oil or gas from producers at the wells, for the purpose of reselling it at a profit. As production falls off, his resales and profits will fall off. But his relation to the production is merely collateral. Before he made his contract, he had no relation to the oil, factual or legal. His contract gave him only somewhat the same kind of an interest in continued production which employees, merchants, homeowners, and others in an oil producing area have in continued production.

For a landowner to have a degree of control over what may be done on neighboring land is not unusual. There is a large body of law relating to *jura in alieno solo*. The recognized natural rights to light and air, lateral support, and the flow of streams exist merely by reason of physical location. Easements, affirmative and negative, are created by grant or by prescription. Restrictive covenants, nearly always negative in nature, are recognized and enforced in equity. All of these are interests, short of ownership, in the land whose use is affected by them. Because of the applicable law, and the location of the plaintiff's land, its economic interest in the oil here in question was just as real and just as legally well-grounded as those in the ordinary cases of rights in the land of another.

Our conclusion is that the plaintiff had an important economic interest in the oil under the State's submerged lands, by reason of its control over the recovery of the oil; that it could have surrendered its control by an outright

sale, but instead took in exchange a share of the possible net profits; and that the reasons on which the depletion allowance is based are present in the plaintiff's situation. We will therefore award the plaintiff a judgment for $182,802.98, with interest according to law.

It is so ordered.

LARAMORE, WHITAKER, and LITTLETON, Judges, concur.

JONES, Chief Judge.

I concur in the foregoing opinion, but with the following added comment:

Ordinarily only the owner of the land in which the oil is located or his assignee has any control over the production of the mineral, and consequently any interest in its extraction from the soil. But here the contracts are conditional and interwoven.

The State of California is the owner of the mineral and the land in which it is found.

If the State, as owner, had made an unconditional lease the economic interest would have been confined to the owner, or the lessee or any subsequent assignee of any interest or part interest from either of them.

But this was a conditional assignment. The only economic interest the lessee could possibly have was the right to extract and sell oil. To make his contract effective and give it any value or interest whatever, it had to be linked to a contract with plaintiff. Otherwise it would have no life and no value. The State law so provided. The contracts were thus tied together and became a part of the warp and woof of the same garment. Neither of the contracts standing alone was effective.

It took the second contract, that with plaintiff, to make the transaction complete. The two contracts were each part of a larger and more comprehensive contract without which no operations could even have been started. If the maker of one essential contract has no economic interest the maker of the other has none.

WHITAKER, Judge, also joins in this concurring opinion.

Findings of Fact

The court, having considered the stipulation of facts entered into between the parties, and the briefs and argument of counsel, makes findings of fact as follows:

1. Plaintiff is a corporation duly organized and existing under the laws of the State of California. Its principal office is located at San Francisco, California.

2. On or about May 31, 1949, plaintiff duly filed with the Collector of Internal Revenue, First District of California (subsequently designated as District Director of Internal Revenue, San Francisco, California, and herein sometimes referred to as Collector), its corporate income tax return for the taxable year ended December 31, 1948, prepared in accordance with the accrual method of accounting.

3. Plaintiff's corporate income tax return for the taxable year ended December 31, 1948, disclosed ordinary net income in the amount of $1,908,703.91. In arriving at said amount of ordinary net income for normal tax and surtax purposes plaintiff deducted percentage depletion of $357,011.28 on account of payments of $1,298,222.85 received from Southwest Exploration Company, a corporation (hereinafter designated as Southwest).

4. In its corporate income tax return for the taxable year ended December 31, 1948, plaintiff computed and disclosed its corporate income tax liability for such year in the total amount of $724,802.72. The amount of its Federal income tax liability as disclosed by its return was duly paid to the Collector and is not in controversy herein.

5. On December 13, 1950, the Internal Revenue Agent in Charge at San Francisco, California, acting on behalf of the

Commissioner of Internal Revenue, proposed an additional income tax liability for the taxable year 1948 in the amount of $457.54. All of said amount of $457.-54, together with interest thereon, was duly paid by plaintiff to the Collector on February 21, 1951, and is not in controversy herein.

6. Upon subsequent audit and review of plaintiff's income tax return for the taxable year 1948, the District Director of Internal Revenue, San Francisco, California (formerly the Collector of Internal Revenue and hereinafter referred to as District Director), proposed additional income tax for the taxable year 1948 in the amount of $135,664.29. On December 30, 1954, plaintiff duly paid to the District Director all of said amount of additional tax of $135,664.29, together with statutory interest thereon of $47,138.69.

7. The additional income tax of $135,-664.29 for the year 1948, as determined by defendant and referred to in the preceding paragraph, was based upon the disallowance of percentage depletion of $357,011.28 as claimed by plaintiff on the payments received by it from Southwest during the taxable year 1948 in the amount of $1,298,222.85 referred to in finding 3 above.

8. On January 3, 1955, plaintiff timely filed with the District Director a verified claim for refund of income tax for the taxable year ended December 31, 1948, in the amount of $135,664.29, plus interest thereon of $47,138.69, together with interest on said amounts as allowed by law.

9. In accordance with the applicable provisions of the Internal Revenue laws, the Commissioner of Internal Revenue notified plaintiff of the disallowance of its aforesaid claim by registered letter dated January 4, 1955.

10. In 1938 the State of California passed the State Lands Act of 1938, now part of the Public Resources Code dealing with the exploitation of oil deposits from the State tidelands. From August 8, 1938, to August 13, 1938, the State Lands Commission published a notice entitled "Notice of Intention of State Lands Commission to Receive Offers to Enter Into an Agreement or Agreements for Extraction of Oil and Gas and Other Hydrocarbons from Certain Tide and Submerged Lands of the State Situate in Orange County, California" (hereinafter referred to as the Notice).

11. The legal description in the Notice referred to in finding 10 divided the land into five parcels, designated A, B, C, D, and E. Each parcel was said to contain 167 acres, more or less. The area of tidelands and submerged lands identified in the original Notice as parcels A to E, inclusive, of said Orange County, California, tidelands and submerged lands constituted the entire area covered by State Easement No. 392 which Southwest subsequently obtained from the State of California in the manner hereinafter set forth.

12. Southwest Exploration Company, a corporation (Southwest), is a corporation organized under the laws of California and was incorporated on June 20, 1933, but remained completely inactive until 1938. Its principal office is located at Los Angeles, California. Prior to the agreements dated August 25, 1938, hereinafter referred to, Southwest did not own, lease, operate or control any of the uplands or littoral lands adjacent to the area referred to in the Notice and subsequently identified as State Easement No. 392.

13. Prior to the transmittal of its bid for State Easement, subsequently identified as State Easement No. 392, Southwest, as Permittee, entered into an agreement for a permit dated August 25, 1938, with Huntington Beach Company, a corporation, plaintiff herein, Pacific Electric Railway Company, a corporation, Pacific Electric Land Company, a corporation, Bolsa Land Company, a corporation, Bolsa Chica Gun Club, a corporation, and Standard Oil Company of California, a corporation, as Permittors. The lands of the Permittors referred to as uplands in the Notice and in the agreement, and more particularly described in

the first "whereas" paragraph appearing on page 1 of said agreement constituted all of those lands referred to as littoral lands and uplands in section 1 of Agreement for Easement No. 392 and elsewhere therein, which are more particularly described in section 1 thereof.

14. On August 25, 1938, Southwest also entered into a second agreement with plaintiff and other upland owners setting forth in detail the procedures to be followed by Southwest in conducting operations from the uplands. Southwest was the only bidder for State Easement No. 392.

15. In accordance with the terms and conditions of the Notice, Southwest submitted its bid to the State Lands Commission on August 30, 1938. With its transmittal letter Southwest filed with the State Lands Commission the following documents:

"(a) Form of Agreement for State Easement, later identified as No. 392, with date omitted but signed by Southwest through its president and secretary; attached to the said Agreement for State Easement No. 392 were those portions of that agreement appearing at the end thereof entitled 'Endorsement by Upland Owners,' 'Exhibit A (for entire tract)' and 'Exhibit B;'

"(b) The permit agreement referred to in finding 13;

"(c) Cashier's check for $15,000 payable to the Treasurer of the State of California;

"(d) Certified copy of resolutions authorizing Southwest's officers to execute the permit agreement and the agreement for easement referred to in finding 13;

"(e) Certificate of ownership showing that all of Southwest's stockholders were residents of the State of California."

Southwest's bid conformed in all respects to the requirements of the State Lands Commission. Southwest furnished the $25,000 bond required by the Agreement for State Easement No. 392.

16. In accordance with the terms and provisions of the State Lands Act of 1938, Cal.Stats.Ex.Sess.1938, c. 5, p. 23, Southwest's bid was accepted, and it entered into an Agreement for State Easement No. 392 with the State Lands Commission on September 26, 1938.

17. There were no "filled lands" as that term is used in Article 6 of the State Lands Act of 1938, Cal.Stats.Ex. Sess.1938, c. 5, which were situated adjacent or contiguous to or otherwise usable or available in the extraction and exploitation of oil, gas or other hydrocarbon substances from the area constituting State Easement No. 392.

18. An agreement dated September 27, 1938, was made between Southwest, as party of the first part, and Huntington Beach Company, a corporation, Pacific Electric Railway Company, a corporation, and Pacific Electric Land Company, a corporation, as second parties. The agreement of September 27, 1938, supplements the prior agreements of August 25, 1938, between Southwest and the upland owners and provides a manner of computation of the amounts payable to plaintiff and other upland owners in consideration of the rights and privileges given by the upland owners to Southwest in the two agreements entered into on August 25, 1938, referred to in findings 13 and 14. Southwest entered into the agreement of September 27, 1938, with plaintiff and other upland owners in consideration of the rights and privileges granted to Southwest by the upland owners in the agreements of August 25, 1938.

19. Amendments to the Agreement for State Easement No. 392 were duly executed on December 6, 1938, and March 22, 1939, respectively.

20. All surface facilities and operations in connection with and for the drilling of and production of oil and gas from the wells covered by State Easement No. 392 and the tops of all such wells drilled pursuant thereto and in accordance with the terms of Southwest's

agreements with the upland owners, during the period here material from which plaintiff received payments from Southwest, computed in accordance with the agreement of the parties dated September 27, 1938, were on upland property owned by Huntington Beach Company, plaintiff herein. Said wells were drilled on a slant toward the ocean and, accordingly, went through and under land owned by the plaintiff herein and land owned or leased by Pacific Electric Railway Company and Pacific Electric Land Company so that the bottoms of said wells were out under the Pacific Ocean.

21. Southwest erected on the lands owned by plaintiff all the ordinary facilities, including its field office, settling and shipping tanks, pipelines, and other equipment and appliances required in connection with its business operations. Under the provisions of State Easement No. 392 it was required that each well be drilled by slant drilling from the uplands to and into the subsurface of the State lands covered by State Easement No. 392. All subsurface operations in connection with the drilling and operation of the wells covered by State Easement No. 392 on account of which plaintiff received payments from Southwest were conducted from and through the land owned by plaintiff herein, and through land owned or leased by Pacific Electric Railway Company and Pacific Electric Land Company.

22. Huntington Beach Company, plaintiff herein, and other upland owners, in accordance with the agreements dated August 25, 1938, and the agreement dated September 27, 1938, received payments during the taxable year which were referred to in the September 27, 1938, agreement as "an amount equal to the following percentages of the 'net profits'" from the operation of the wells here involved as shown below:

Huntington Beach
Company .............. 17.75 percent
Pacific Electric Railway
Company ............. 1.576 "
Pacific Electric Land
Company ............. 5.174 "
24.5 "

23. The following tabulation shows the amount paid to the plaintiff by Southwest in the year 1948, and the manner in which that amount was determined:

1948
Total Southwest Income
from State Easement
No. 392 ............. $19,148,536.60
Chargeable Expenses ... 11,834,605.01
Southwest's Net
Income ............. 7,313,931.59
Amount paid to Huntington Beach Co. in accordance with agreement .............. 1,298,222.85

24. Under the terms of the Notice issued by the State Lands Commission and referred to in finding 10, each bidder, as a condition precedent to the consideration of his bid for State easement, was required to present evidence satisfactory to the State Lands Commission of his present ability to furnish all necessary sites and rights-of-way without cost or obligation to the State for all operations contemplated under the provisions of the form of bid for State easement to be submitted to the State Lands Commission and any bid not accompanied by such evidence would be rejected by the Commission.

25. The evidence of each bidder's present ability to furnish the above-mentioned sites and rights-of-way had to include (1) an endorsement on the Agreement for State Easement by the owner or owners of the real property described as "uplands" in said agreement that the bidder has been granted all such necessary sites, rights-of-way and easements, and (2) the originals or certified copies of the instrument or instruments vesting in such bidder such sites, rights-of-way and easements.

26. The parties to the August 25 1938, agreement referred to in finding 13, identified therein as Permittors, were the owners of all of the uplands or littoral lands identified as such in the Notice and the Agreement for State Easement No. 392. Under the terms of that agreement of August 25, 1938, the Permittors granted to Southwest the neces-

sary easements, rights and rights-of-way over, on, and through their uplands for the conduct of Southwest's operations under the form of Agreement for State Easement submitted to the State Lands Commission by Southwest for the extraction of oil, gas and other hydrocarbon substances from the area of State-owned tide and submerged lands described in the Notice issued by the State Lands Commission. The easements, rights and rights-of-way granted Southwest in said agreement by the Permittors remained in effect only during such time as the State easement, or any modification, renewal, extension of, or substitute therefor, was in force and effect.

27. Under the terms of the second agreement referred to in finding 14 executed on August 25, 1938, by the plaintiff herein, Pacific Electric Railway Company, a corporation, Pacific Electric Land Company, a corporation, and Standard Oil Company of California, a corporation, as upland owners and referred to as Permittors and first parties, and Southwest, as second party, and referred to as Permittee, the parties agree (1) that the surface location and subsurface course of Permittee's wells drilled through the uplands pursuant to the State easement shall be agreed upon by Standard Oil Company of California, a corporation (Standard) and Permittee; (2) that all drilling schedules of Permittee and all redrilling, deepening and other work designed to change the subsurface course or location of Permittee's wells through the uplands shall not be undertaken without Standard's prior approval; (3) that the location of all surface facilities, the quality of all equipment to be used by Permittee in connection with such facilities and the manner of performing all drilling and other operations by Permittee shall be first approved by the Permittors.

28. That agreement also provided (1) that Southwest (Permittee) should, upon request, furnish Standard, et al., copies of logs, record of well cores, electrical logs or surveys, water entrance surveys, plats and surveys showing the location and course of each and every well drilled by Southwest through the uplands pursuant to the State easement and all other technical information and data concerning said wells. Under the terms of that agreement the rights granted by the Permittors were personal to Southwest, nonassignable without the consent of the Permittors and binding upon the successors and assigns of the parties to said agreement.

29. The Agreement for State Easement No. 392 conformed to the terms and provisions of the State Lands Act of 1938 and granted Southwest an easement to extract, remove and produce from the State lands oil, gas and other hydrocarbon substances through wells to be drilled, operated and maintained by Southwest, the tops of which wells were required to be located on the littoral lands or uplands described in the Notice for bids issued by the State Lands Commission and owned by the parties identified as Permittors in the agreements of August 25, 1938, referred to in findings 13 and 14.

30. On September 27, 1938, Southwest entered into the agreement, referred to in finding 18, with plaintiff and other upland owners. This agreement supplemented the prior agreements of August 25, 1938, and provided a manner of computation and distribution of rental for the rights and privileges given by the upland owners to Southwest in the August 25, 1938, agreements. Under said September 27, 1938, agreement as sole consideration to plaintiff for permission to use its uplands in the manner provided by the August 25 agreements, Southwest agreed to pay plaintiff, as one of the upland owners, an amount equal to 17.75% of the net profits from the extraction of oil and gas from the wells covered by State Easement No. 392.

31. The September 27, 1938, agreement provided for the calculation of net profits as gross proceeds from Southwest's operations in a designated portion

of the State lands, minus chargeable expenses, and the gross proceeds included the sale value of all oil produced and saved and all gas produced and sold and 50 percent of all gasoline extracted from gas, minus State reserves, plus proceeds of rentals, etc., the cost of which had been a chargeable expense. Under the provisions of said agreement chargeable expenses included all normal operating costs.

32. Under the applicable provisions of the State Lands Act of 1938 and the corresponding provisions of the Public Resources Code and the terms of the Notice, the use of the uplands adjacent to the area covered by the Notice and State Easement No. 392 was necessary for purposes of mineral extraction from said State Easement No. 392, and without the use of the surface of the uplands there could be no extraction of oil and gas from said State Easement No. 392.

33. Through their control over production of oil and gas from State Easement No. 392, the upland owners or their Permittees were the only parties qualified to bid for State Easement No. 392. The plaintiff possessed an economic interest in the production and sale of oil and gas from State Easement No. 392.

### Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover and it is adjudged and ordered that plaintiff recover of and from the United States the sum of one hundred eighty-two thousand eight hundred two dollars and ninety-eight cents ($182,-802.98) with interest according to law.