**Thomas M. ROBINSON, District Director of Internal Revenue, Appellant,**

v.

**William G. ELLIOT, Appellee.**

**Thomas M. ROBINSON, District Director of Internal Revenue, Appellant,**

v.

**Thomas W. ELLIOT, and Evelyn W. Elliot, Appellees.**

**Nos. 15983–15984.[1]**

United States Court of Appeals
Ninth Circuit.
Dec. 5, 1958.

1. Two separate cases on the same general subject matter were consolidated for trial. Separate judgments were entered and separate appeals taken.

Charles K. Rice, Asst. Atty. Gen., Helen Buckley, Lee A. Jackson, Melva M. Graney, Fred E. Youngman, Attys., Dept. of Justice, Washington, D. C., Krest Cyr, U. S. Atty., Butte, Mont., for petitioner.

Felt, Felt & Burnett, Jack W. Burnett, Billings, Mont., for respondent.

Before HEALY, POPE and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge. ·

The Buttrey Company, a Montana corporation, in November, 1955, received title to the Buffalo Block in Kalispell, Montana, by virtue of a warranty deed placed in escrow in February, 1946, by William G. Elliot, Thomas W. Elliot and Evelyn W. Elliot (hereafter "taxpayers"). The three were and are citizens of Montana. The men are brothers. Thomas is the husband of Evelyn.

The basis for the deed in escrow was a "Lease Agreement and Purchase Option" dated January 14, 1946, between Buttrey and the Elliots as owners of the Buffalo Block. The "block" consisted of a basement, two stores on the first floor, office rooms upstairs and the ground on which the building was located. The

brothers Elliot at the time they entered into the agreement were operating a general store known as the Flathead Commercial Company. The agreement respecting the building was apparently a part of a sale of the Flathead Commercial Company by the Elliots to Buttrey which operated a chain of stores in Montana.

We are here concerned only with the federal income tax consequences of the "Lease Agreement and Option to Purchase" for the years 1947 to 1953 inclusive. Aspects of the sale of the going business are not involved. The lease and option by its terms provided for ten annual payments of $19,000 each as rent with an option at the end for Buttrey to acquire the property for the sum of $75,000. In the ten year interim Buttrey was to be responsible for all of the usual burdens of the owner such as property taxes, insurance premiums and repairs. In real estate language, if it was a lease, it was as to the lessors a "carefree" lease.

No doubt under Montana law the document would be always what it called itself: "Lease Agreement and Purchase Option." In the terms of a value of $75,000, one sees that the net return as "rent" each year would be 25.33 per cent.

At least from 1946 to 1951 the taxpayers (Elliots) acceded to the theory that the agreement for tax purposes was what it was denominated. They returned the annual payments as rents received.[2]

Eventually the taxpayers bestirred by a new accountant filed claims for refund on the theory that the transaction, ab initio, was a sale.

The claims not being allowed, eventually the taxpayers filed suit for refund on the basis of the lower tax rates applicable for a capital sale profit contrasted with the progressive rates applicable for the receipt of ordinary rent.

We deem the only question properly before the trial court and this court to be whether the taxpayers had a right to recast the transaction from its form to what they considered its substance.

The district court ruled in favor of the taxpayers. Its principal authority was Oesterreich v. Commissioner, 9 Cir., 226 F.2d 798. See also Commissioner v. Wilshire Holding Corporation, 9 Cir., 244 F.2d 904, certiorari denied 355 U.S. 815, 78 S.Ct. 16, 2 L.Ed.2d 32, and Wilshire Holding Corporation v. Commissioner, 9 Cir., 262 F.2d 51. We affirm on the same basic authority.

Of course the facts here are not as obvious as in Oesterreich where the lessor was to transfer title at the end of a term for the sum of ten dollars. Here in Elliot the court received parol evidence as to intention, the motive in disposition, the price the taxpayers sought for an outright sale and other background matter. This evidence came in over objection, the court announcing it would later consider the merit of the objection. The evidence was not contradicted and no effort was made to impeach the Elliots who testified. Perhaps, the court would have been justified in recasting the agreement for tax purposes without receiving the evidence. But when the agreement and the evidence all point the same way, we see no reason to stop and consider whether the receipt of parol evidence was proper. Further, the receipt of such evidence is not really, per se, assigned as error on this appeal.

Of course, Buttrey is not before us, but we do express the opinion that it did convert a capital expenditure into an expense on its side. Some things which one can do to save taxes are unassailable. A desire to save taxes is ordinarily decent, but in a case like we have here the "lessee-purchaser" will just have to take a gamble that his legal format will stick. (We do not say that anyone was indecent here.)

We note one factor in this case which was overlooked and which we do not deem appropriate to import or introduce into the judgment in view of the record of the case. We refer to interest on deferred payments. In Oesterreich we were informed that in recasting instruments from leases to installment

---

2. Apparently no copy of the basic agreement accompanied the annual income tax returns.

sales the commissioner as office practice sometimes introduces the factor of interest to the seller from the buyer when he converts "rent" to "purchase price." The rental payments, so the statement during argument in Oesterreich went are divided between principal and interest. In the second Wilshire case we are now awaiting the views of the tax court on that subject. Parenthetically, it may be noted, after making the deal here, one of the Elliots had someone compute the "lease agreement" for him on the basis of various interest rates so for his own satisfaction he might know how much principal they were reasonably getting out of the transaction. This private computation did not bind the commissioner, but it does illustrate an economic fact cognizable by almost anyone in business.

The district court's opinion (which preceded a later stipulation [3] as to amounts refundable for various years, findings of fact with conclusions of law and a judgment) held that for tax purposes a sale with installment payments occurred in 1946, thus recasting the transactions. We think it fair to say that the computation stipulated to by the parties provided for division of the profit proceeds into installments according to years.

Doubling back into the facts, we think it should be related that in the taxpayers' claims for refunds filed with the director for the years 1946, 1947 [4] and 1948 the taxpayers took the position of reporting the "sale" on an installment basis. Similarly, they proceeded on their first claims for refund for the years 1949 and 1950. Subsequently, they amended these two claims and asserted that the sale was completed in 1946 and all reportable in that year. This last position was the one they took in the claims filed for the years 1951, 1952 and 1953.

Except as to the years 1951, 1952 and 1953 the amounts "claimed" in the complaints do not agree in amount with the claims filed with the director. Just exactly how the amounts in the complaint as to the years 1946 to 1950 inclusive, or all of the amounts in the second stipulation for the various years, were computed we do not know. But we are satisfied that all amounts in the complaint and in the second stipulation contemplated installment treatment all of the way from 1946 to 1955.

To reach two questions presented here we must allude to the first or pre-trial stipulation filed by the parties. Most of it covers technical details such as the filing of returns, the amounts paid and the details of the refund claims. Paragraphs 23 and 24 of this stipulation provided as follows:

"23. If the court holds that the 'Lease Agreement and Purchase Option' constitutes, for federal income tax purposes, a sale or a conditional sale, then in order to conserve the time of the court it is further stipulated that the parties will submit computations of amounts of overpayment to be entered for the respective years as judgment for plaintiff, and if the computations submitted by the parties differ in amount, the parties shall be afforded an opportunity to be heard in an argument on the date fixed by the court and thereafter the court will then determine the correct overpayment and enter its decision.

"It is understood and agreed that any argument as to the correct computation of any overpayment shall be strictly confined to the considera-

---

3. There were two written stipulations in the case. The first would appear to be the result of some sort of informal pre-trial procedure. The second involved computations and was required by the first.

4. In the first stipulation taxpayers agreed

with the government that William G. Elliot's claim for refund for 1946 was not timely. Also, it was agreed that claims of the Thomas W. Elliots for both 1946 and 1947 went in too late. Therefore, recovery of taxes for the years and persons indicated were accordingly denied in the judgments.

tion of the correct computation and shall not be used for the purpose of affording an opportunity for rehearing or reconsideration.

"24. If the court holds that the 'Lease Agreement and Purchase Option' does not constitute, for federal income tax purposes, a sale or a conditional sale, then it is further stipulated that the defendant is entitled to a judgment that the plaintiff's complaint be dismissed, together with the costs of the action."

The stipulation was signed for the director by an attorney from the department of justice on the ground in Billings to assist in the trial.

At the trial, after counsel for the taxpayers made an opening statement, the same government lawyer made a statement. Both statements indicate that counsel were agreed that the only real question before the court was whether the taxpayers could establish the 1946 transaction as some kind of a sale from the beginning for tax purposes rather than a lease and option. Government counsel said,

"* * * I do not consider there is really any tax question involved for the reason * * * the government is only a stakeholder * *.

"There is no real tax controversy between the parties."

The silent import of the statement, we take it, was that if the Elliots won at the trial then the government would go after Buttrey on its deductions taken for rent.

The trial closed with the only apparent issue being: "Was it a sale or wasn't it?" Briefs were required to be filed by the trial court. There for the first time the government raised the contentions that the taxpayers were not entitled to installment treatment of the payments because they had not made a "timely election" to use installment treatment.[5]

Further, the government said the taxpayers having chosen to file their claims for the years 1951, 1952 and 1953 on the theory of a completed sale in 1946 could not use the installment basis for those years. It would not be quite correct, but almost, to say the government's position was that the taxpayers were wrong either way they did it—even if a sale be assumed. The contentions no timely election and improper claims were brushed aside by the court in its opinion preceding the stipulation (the second one) of amounts for the judgment. The contentions are renewed here partly stated in terms of "jurisdiction" (particularly as to second point) as they were when belatedly made in the trial court.

Of course, jurisdiction is a rubbery word. We can see no element in the matters raised affecting the fundamental power of a court to act. Perhaps the first point would have required serious consideration if it had been timely raised. The second point is not as if the taxpayers had filed no claim at all or had filed a vastly different claim than that on which they sought recovery. All the taxpayers did was to assert in the refund claims in midstream a new theory on the same facts. The amount claimed for refund for the years 1949 to 1953, wherein the shift in theory was made, was in excess of the amount claimed by the complaint or allowed by the court. But we do not reach these questions, because we believe that the first stipulation of the parties precluded the consideration of such questions. Further, the conduct of counsel during trial reaffirmed this position.

The stipulation was not ridiculous or anything for which government counsel should be censured. No effort was ever made to be relieved of the stipulation. Government counsel did not stipulate that the United States of America is a monarchy or that if the taxpayers were cor-

---

5. The questions here all arose under the 1939 Internal Revenue Code, 53 Statutes at Large, 4 et seq., 26 U.S.C.A. § 1 et seq. Section 44 thereof would be the applicable section affecting the use of installment reporting. See also sections 29.44-2, 29.44-3 and 29.44-4 of Treasury Regulations 111 and sections 39.44-2, 39.44-3 and 39.44-4 of Treasury Regulations 118.

rect as to theory they should be entitled to recover a tenfold penalty against the government. The stipulation was a reasonable one and the government should be held to it. It should not be permitted here after the evidence goes badly at trial to bring in these two points where the taxpayers have gained no unconscionable advantage. So we reject the points. The government knew as early as March, 1951, that the taxpayers were claiming a sale. The government has demonstrated in the Oesterreich and Wilshire cases that it can protect itself against those in the position of Elliots and Buttrey. Also, it was able to do it in Commissioner v. Southwest Exploration Company, 9 Cir., 220 F.2d 58, reversed 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347; and Huntington Beach Company v. United States, 132 F.Supp. 718, 132 Ct.Cl. 427, affirmed 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347.

The judgment of the district court is affirmed.

