SIRLOIN STOCKADE, INC., KING SIRLOIN OF COLORADO, INC., AND SIRLOIN STOCKADE OF MINNESOTA, INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sirloin Stockade, Inc. v. Commissioner
Docket No. 6400-78.
United States Tax Court
T.C. Memo 1980-303; 1980 Tax Ct. Memo LEXIS 277; 40 T.C.M. (CCH) 928; T.C.M. (RIA) 80303; August 11, 1980, Filed Christopher McLain and Wilfred F. Roberge, for the petitioners. Osmun R. Latrobe and James D. Thomas, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Petitioner
TYE
Deficiency
Sirloin Stockade, Inc.
Aug. 31, 1972
$1,476.00
Aug. 31, 1973
8,546.10
Aug. 31, 1974
59,760.33
Feb. 2, 1975
23,495.46
(short period)
King Sirloin of Colorado,
Inc.
Aug. 31, 1974
226.00
Sirloin Stockade ofMinnesota,
Inc.
Aug. 31, 1974
289.81
By amended petition, Sirloin Stockade, Inc., has asserted overpayments resulting from additional claims for interest deductions for its taxable year 1972 and 1973 by its predecessor in interest. All issues between the parties, including the manner of apportioning the interest payment which may be allowable by virtue of our decision herein, have been settled by the parties. The determination of the amount of that interest payment turns upon the fair market value of the common *279 stock of Sirloin's predecessor in interest on February 16, 1972 -- the sole issue remaining for decision. FINDINGS OF FACT Most of the facts have been stipulated and are so found. The stipulated exhibits are also incorporated herein by this reference. Sirloin Stockade, Inc., is a Nevada corporation organized on September 8, 1972, and is successor in interest, by virtue of a statutory merger on January 1, 1973, to Sirloin Stockade, Inc., an Oklahoma corporation organized on May 26, 1966 (hereinafter Sirloin). [1] As successor in interest to the latter, the former Sirloin is liable as a transferee with respect to any deficiencies determined against the latter. Sirloin's principal place of business, at the time the petition herein was filed, was in Oklahoma City, Oklahoma. During the periods at issue herein, Sirloin maintained its books and records and filed its Federal income tax returns using the accrual method of accounting *280 on a fiscal year basis. Sirloin's business was begun in the mid-1960's as a sole proprietorship of William L. Keele (Keele). It operated or franchised limited menu, self-service, economy steakhouse restaurants. Expansion in the number of stores in the chain was accomplished during the ensuing period generally by two alternate methods: franchising to independent operators, and leasing of facilities for company operations.
The following chart reflects the number of franchises and leased company operated stores during the fiscal years indicated: Franchises
Company operated
Year ending
Total
Added in year
Total
Stores Opened
8/31/69
1
0
5
1
1970
12
11
10
5
1971
16
4
12
2
1972
26
10
17
5
1973
39
13
38
21
3/3/74
46
7
59
21
(7 mos.)
In the latter half of 1971, Sirloin officials (in particular, Keele) approached Charles A. Vose of the First National Bank of Oklahoma City, Oklahoma (the Bank), with regard to the financing of a program for expansion of the number of its stores operated by Sirloin. Negotiations ensued between Sirloin and First Oklahoma Realty Investment Corporation, Inc. (FORIC), a subsidiary *281 of the Bank. On February 16, 1972, Sirloin and FORIC entered into an agreement (First Agreement) providing, in relevant part, that FORIC agreed to purchase from Sirloin, at its cost, a number of restaurants to be constructed by Sirloin, up to a total value of 1,500,000. FORIC also agreed to lease these same restaurants back to Sirloin pursuant to standard leases providing for a per annum rental during the first five years of eight percent of the purchase price, and during the remaining 15 years (and additional five-year option period) at 12 percent of the purchase price. FORIC further agreed to provide interim construction financing for the acquisition and construction of restaurants at eight percent simple interest per annum. [2]Sirloin had five years in which to avail itself of the terms of the agreement. Pursuant to the First Agreement, Sirloin constructed eight restaurants at a total cost of $1,480,000, which restaurants were sold to FORIC and leased back by Sirloin *282 by December 1, 1973. [3]
In consideration of FORIC entering into the First Agreement, on February 16, 1972, Sirloin granted FORIC an option to purchase 111,100 shares (constituting approximately 10 percent of the issued and outstanding shares, including the optioned shares) of Sirloin's authorized but unissued stock at $0.508 per share. This price was equivalent to the book value per share of Sirloin, based on an audit report, dated October 1, 1971, for its fiscal year ending August 31, 1971. FORIC received a further option to purchase, or otherwise acquire, from Sirloin 11.11 percent of the number of shares of any class of authorized but unissued stock (or options for such stock) which Keele or any relative of his would *283 thereafter acquire from Sirloin at a price equivalent to that paid by Keele or his relative. If Sirloin had not granted FORIC the options to purchase its stock, FORIC would not have entered into the First Agreement. With respect to the 111,100 shares, FORIC exercised its options as to 55,550 shares of Sirloin stock on August 31, 1972, and as to 55,550 shares on April 10, 1974 (as of March 31, 1974). Sirloin's shares were not publicly traded. The option agreement provided that FORIC agreed to accept shares acquired thereunder only for investment purposes and not with a view to distribution. Each of the shares issued was to, and did bear, the following legend: [4]
The securities represented by this certificate have not been registered under the Securities Act of 1933 or the Oklahoma Securities Act. These securities have been acquired for investment and may not be sold or transferred for value in the absence of an effective registration of them under the Securities Act *284 of 1933 and/or the Oklahoma Securities Act, or an opinion of counsel to the company that such registration is not required under such Act or Acts. However, the option agreement also provided that Sirloin would file Federal and State registration statements for the shares acquired and attempt to make them become effective, upon FORIC's request and the happening of certain events at specified times in the future, and that FORIC's shares could at its election, be included in any public offering by Sirloin. Liquidated damages for Sirloin's failure to comply with the undertaking were provided for as the greater of (1) closing price (if the stock was publicly traded) less FORIC's cost, or (2) FORIC's purchase price plus interest at 10 percent per annum. During the period January 1, 1971, through December 31, 1973, 11 sales of Sirloin stock occurred, excluding the sale to FORIC.The seller in each transaction was a trust for the benefit of the children of Keele. The purchasers approached Keele seeking an interest in Sirloin. In each transaction, listed below, the stock was acquired at a price of $5 per share: Date
Number of Shares
Purchaser
2-22-72
2,000
Abe Morris
4-03-72
2,000
Robert Mosely
4-12-72
20,000
Pactum, Ltd.
6-08-72
14,000
Dr. Francis D. Oakes
2-06-73
100
Robert H. Murcer
2-08-73
300
Ron Perry
2-23-73
5,000
Charles Vose, Jr.
2-23-73
5,000
Charles Vose, Jr.
2-23-73
5,000
RAVCO
2-23-73
2,500
Barbara Vose, Custodian
2-23-73
2,500
Barbara Vose, Custodian
*285 Abe Morris was one of the builders used by Sirloin. Robert Mosely was a Sirloin franchisee. Pactum, Ltd., essentially was the trusts of one H. H. Champlin, an investor in the oil business. Champlin's son was Sirloin's landlord for a number of the steak houses, and also a franchisee. Dr. Oakes, an anesthesiologist, was a long-time acquaintance of Keele's, as was Robert Murcer. Charles Vose, Sr., was the chairman of the board of the Bank; Charles Vose, Jr., his son; RAVCO, the Vose's family trust; and Barbara Vose was the custodian of a trust for the Vose's children. [5]
On June 1, 1972, Sirloin established the Sirloin Stockade Qualified Stock Option Plan (the Plan). During the period from June 1972 through November 1, 1973, a total of 152 options totaling 41,900 shares were granted to Sirloin employees pursuant to the Plan. Each of the options was granted at an exercise price of $5 per share. Under the terms of the Plan, the option price could not be less than the fair market value of the stock when granted. See section 422(b)(4). [6]
*286 The book value per share and earnings per share of Sirloin common stock at the end of the following fiscal years were: Shares
Per Share
Per Share
FYE
Outstanding
Book Value
Earnings
8/31/68
1,000,000
$0.157
$0.04
8/31/69
1,000,000
0.266
0.07
8/31/70
1,000,000
0.365
0.10
8/31/71
1,000,000
0.508
0.14
8/31/72
1,055,550
0.781
0.27
8/31/73
1,113,070
1.421
0.50
3/31/74
1,202,120
1.712
0.30
(7 mos.)
Sirloin's gross receipts and taxable income for its fiscal years ending in 1972 through 1975 were reported as follows: FYE
Gross Receipts
Taxable Income
8/31/72
$ 6,174,217
$ 420,864
8/31/73
10,924,574
715,943
8/31/74
19,970,002
1,233,423
2/2/75 (short year)
9,857,757
330,361
On its Federal income tax return for the taxable year ending August 31, 1973, Sirloin reported the acquisition on April 1, 1973, of substantially all the assets of Sirloin Stockade of Missouri, Inc. (Missouri), and of all of the capital stock of Dollars, Inc., and Sir Sirloin, Inc., on June 1, 1973. Sirloin obtained assets of Missouri with a total basis of $106,758.40 and assumed liabilities totaling $72,307.03 (in book *287 value). Missouri received 16,920 shares of Sirloin in the exchange. Sirloin's statement in its fiscal year 1973 tax return (pursuant to section 1.368-3(a), Income Tax Regs.) declared "such capital stock [of Sirloin] had a fair market value of $2.04 per share or $34,451.37." On June 1, 1973, all of the capital stock of Dollars, Inc., was obtained by Sirloin in exchange for 29,044 of its shares. Dollars, Inc., had a book value of $100,709.04. The statement accompanying Sirloin's tax return declared that the shares which it transferred "had a fair market value at that time of $3.47 per share or $100,709,04." All of the capital stock of Sir Sirloin, Inc., was obtained the same day in exchange for 10,956 shares of Sirloin's stock. Sir Sirloin, Inc., had a book value of $46,908.46. The statement accompanying Sirloin's fiscal 1973 tax return declared that the shares which it transferred "had a fair market value of $4.28 per share or $46,908.46." In the fall of 1973, Sirloin began discussions which led to an agreement to merge with Howard Johnson. Sirloin (or its shareholders) was to obtain 400,000 shares of Howard Johnson stock, worth approximately $22 *288 to $24 per share. At about that time, Sirloin had approximately 1,113,000 shares outstanding with the result that, in terms of the proposed exchange, each share was valued at approximately $8 to $9 a share. [7] Due to the oil embargo, however, the Howard Johnson stock sank to $8 to $10 per share, and the deal collapsed. On April 3, 1974, Lucky Stores, Inc. (Lucky) offered to acquire all outstanding common shares of Sirloin in exchange for publicly traded common shares of Lucky having a New York Stock Exchange market value of approximately $6.02 for each Sirloin share to be acquired. On June 20, 1974, Lucky acquired all of the outstanding common shares of Sirloin in exchange for Lucky common shares having a market value on that date equivalent to approximately $5.23 for each Sirloin share acquired. OPINION The sole issue presented is the fair market value of a share of Sirloin common stock on February 16, 1972 -- *289 an issue that should never have gone to trial. See Buffalo Tool and Die Mfg. Co. v. Commissioner, 74 T.C.     (May 27, 1980), slip. op. at 18-19. We start with the usual litany in cases such as this. The valuation of stock of a closely held corporation for tax purposes is a pure question of fact. Hicks v. United States,486 F.2d 325, 328 (10th Cir. 1973); Duncan Industries, Inc. v. Commissioner,73 T.C. 266, 276 (1979). The burden of proof is on the petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure; Hamm v. Commissioner,325 F.2d 934, 937 (8th Cir. 1963) affg. a Memorandum Opinion of this Court; Duncan Industries, Inc. v. Commissioner,supra at 275. "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Section 20.2031-1(b), Estate Tax Regs.; section 1.170-1(c)(1); Income Tax Regs.; United States v. Cartwright,411 U.S. 546, 551 (1973); *290 Palmer v. Commissioner,62 T.C. 684, 696 (1974), affd. 523 F.2d 1308 (8th Cir. 1975). See generally Rev. Rul 59-60, 1959-1 C.B. 237. Initially, we observe that we are dealing with a fast growing, closely-held corporation which had just received a very substantial boost (in the form of the First Agreement), and a balance sheet which was five-and-a-half months out of date and did not account for the going-concern value of the business or possible appreciation in the value of its tangible assets. Petitioner relies heavily on the sales of Sirloin stock made within a year or so subsequent to the valuation date in determining the value of unlisted stocks. In determining the value of unlisted stock, actual sales made in reasonable amounts at arm's length within a reasonable time before or after the valuation dates are the best indicia of market value. Duncan Industries, Inc. v. Commissioner,73 T.C. at 276. As the sales are further removed from the valuation date, however, their relevancy lessens; we are reluctant to project the *291 sales prices backwards in time. Buffalo Tool and Die Mfg. Co. v. Commissioner,supra at slip op. 16-17; Messing v. Commissioner,48 T.C. 502, 509 (1967). See also 10 Mertens, Law of Federal Income Taxation (Doheny Rev. 1976), sec. 59.16. As a consequence, we have considered the Howard Johnson transaction (which occurred in the fall of 1973) and the Lucky transaction (which did not occur until the spring of 1974) as having only a peripheral bearing on the value of the Sirloin stock as of February 16, 1972, although it is obvious that such transactions confirm the growth of Sirloin's business. In the instant case, all of the sales of Sirloin stock were private and made by the same party to the ultimate purchaser. The price per share in each case remained constant at $5. Despite respondent's protests to the contrary, we believe that each of these sales was made at arm's length. The mere fact that most of the purchasers had close personal and business relationships with Keele by no means requires a contrary conclusion. Neither the seller nor any of the purchasers was under any compulsion to buy or sell and all were in a position to make their own valuation *292 judgments. In fact, the franchisees and Vose, whose family purchased 20,000 shares one year after the first agreement, were in a good position to value the company, including its potential for growth. While none of the sales was for as many shares as were the subject of FORIC's options, the shares ultimately purchased by FORIC still represented only a minority interest, more than offset by Keele's and his family's shares. More to the point is that the testimony of Keele, whom we saw and heard, has convinced us that the purchasers dealt with the seller in an arm's-length context and were not likely to pay more than the stock was wroth (a situation which is the opposite of the usual valuation case where private sales are being relied upon to produce a seller value for the shares being valued.) [8] In this connection, we note that respondent offered no evidence other than by way of cross-examination of Keele. This he was privileged to do, but he ran the risk that such cross-examination would not cause us to hold that Keele's testimony did not constitute significant support to petitioner Sirloin in carrying its burden of proof. [9]
*293 We recognize that all of the sales were subsequent to the grant of the option, but we discount this factor in the instant context because Sirloin had already established an impressive growth record which was fortified by the financing package supplied by FORIC. The additional growth expected to result from the First Agreement was likely to have been among the factors the parties considered in arriving at the purchase price of $5. That price was approximately 36 times earnings (as of August 31, 1971), which, according to Keele, was well beneath the price-earnings ratio at which publicly-held fast food corporations' shares were trading. Even if we assume that $36 was unduly high in terms of a price earnings ratio, several purchases occurred after Sirloin was into the second half of its 1972 fiscal year -- a year in which its earnings per share almost doubled. Such growth was undoubtedly well under way by the time the purchases took place. Obviously, the increase in earnings significantly cut the price-earnings ratio of a share of Sirloin's stock and produced a much lesser multiple in terms of the $5 purchase price. Petitioner also points to the fact that Sirloin's Qualified *294 Stock Option Plan, established on June 1, 1972, established an option price of $5 in accordance with the provisions of section 422(b)(4), which requires that the option price under such a plan be "not less than the fair market value of the stock at the time such option is granted." Respondent seeks to persuade us that the $.508-per-share value used in the agreement between Sirloin and FORIC should be considered the value of a share of Sirloin common stock arrived at through arm's-length negotiations. Book value has been considered an inadequate measure of value. See 10 Mertens, supra, sections 59.10 and 59.61, and the cases collected therein. The circumstances herein are strikingly similar to those which existed in Duncan Industries, Inc. v. Commissioner,supra, where we held that the use of book value in arm's-length negotiation was inappropriate. See 73 T.C. at 277. See also Palmer v. Commissioner,supra.Accordingly, we conclude that the $.508-per-share value is not representative of fair market value. We are not disposed *295 to reach a different conclusion by distinguishing Duncan Industries, as respondent would have us do, because short-term construction loans rather, than long-term financing, were involved herein, nor because the option price in Duncan Industries was substantially below book value. Respondent also argues that the value of the option should be reduced to reflect the impact of the legend restricting the resale of the shares. We disagree. All of the shares sold by Keele and his family carried the same legend. If anything, the shares purchased via the exercise of the FORIC option were of greater value because the option agreement provided that they would be registered, upon demand, after the happening of certain events and because Sirloin agreed to repurchase the shares, if desired, at a fixed price (though this price could have been less than the value we have ascribed to the shares). The shares sold to the other investors did not have the benefit of comparable provisions.
Respondent further relies on the statements of fair market value below $5 which appear in Sirloin's 1973 tax return (see pp. 10-11, supra). Without spelling out the arithmetical details, it is evident *296 that Sirloin calculated such values based upon book value, which did not reflect intangibles or unrealized appreciation in tangible assets. We have no way of knowing the fair market value of what Sirloin received in exchange for its stock, having only the book value of the acquired corporations in the record. Moreover, respondent has not explained how the stock could have values of both $3.47 and $4.28 per share on the same day, to wit, June 1, 1973, in transactions involving substantially the same parties, [10] much less why the stock would have jumped in value to either of these figures from $2.04 on April 1, 1973. [11]
We think that, under the circumstances, respondent's attempt to breathe substance into Sirloin's use of the label "fair market *297 value" in respect of these acquisitions has no more validity than his attempt to equate the fair market value with the use of the book value of Sirloin's stock in fixing the FORIC option price. Respondent also suggests a possible value of $2.75 per share. He obtains this figure by reducing the $5 per share price obtained in 1973 by the ratio of Sirloin's financial factors for 1972 to those for 1973. As explained at pp. 13-14, supra, we are reluctant to project value back in time, particularly when it is done so arbitrarily. Respondent has failed to convince us of the validity of this method. Similarly, we reject his argument that since the value of each Sirloin share in June 1974 was $5.23 (based on the acquisition by Lucky), [12] it must have had a lesser value two years earlier. Having decided the valuation issue for the reasons heretofore stated, we need not discuss petitioner's *298 alternative valuation proposal -- the barter-equation method. We would note, however, that petitioner has attempted to extrapolate values representing the fact that no loan fee was charged, the lesser rentals during the first five years of the leases, and the intangible value of the largescale financing obtained from FORIC. In so doing, petitioner relies by analogy on the methodology suggested by Duncan Industries, Inc. v. Commissioner,supra.The fact of the matter is, however, that the record herein simply does not contain sufficient evidence to support such an extrapolation, even if we were disposed to engage in the exercise. Finally, the record herein is lacking in many elements of evidence that we would expect to find in a valuation case. For example, neither side called any independent expert witnesses. Petitioner Sirloin relied, as it was entitled to do, on the $5 purchase price paid by third parties and Keele's testimony and, as it happens, has succeeded in persuading us that we should hold that it has carried its burden of proof. Respondent relied on his ability to shoot holes in petitioner Sirloin's case by merely contending that the stipulated *299 facts and the testimony of Keele would be insufficient to enable it to carry the day -- reliance which has proved unsuccessful. The overtones of respondent's presentation suggest that he counted on the fact that we would find some middle ground between the values of $5 and $.508 per share of Sirloin's common stock. If that was his objective, he has missed his mark. See Buffalo Tool and Die Mfg. Co. v. Commissioner, 74 T.C.     (May 27, 1980), slip op. at 18-19. Decision will be entered under Rule 155.
Footnotes
1. In the interest of simplicity and because distinguishing between the two corporations would not affect our decision herein or the reasoning in support thereof, both corporations are referred to hereafter, individually and collectively, as "Sirloin".↩
2. The First Agreement contemplated, but did not require, that Sirloin utilize FORIC for interim financing. Nor did it require Sirloin to offer FORIC any or all restaurants it developed during this period.↩
3. The initial funds were rapidly committed for construction. Sirloin and FORIC soon entered into a second agreement August 31, 1972, providing that FORIC would again agree to purchase restaurants to be constructed by FORIC and then lease them back to Sirloin for 20 years at a rental of 12 percent of the purchase price. The total of the restaurants to be purchased was again limited to $1,500,000, and FORIC agreed to provide interim construction financing.↩
4. All outstanding shares of Sirloin issued after 1971, not just those issued under this option, were issued under the private offering exemption to the securities registration laws, and bore this legend.↩
5. Ron Perry, the other purchaser of Sirloin stock, was not otherwise identified in the record.↩
6. All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
7. The record is unclear as to how many shares were outstanding at that time. Our calculations are based on such shares as of August 31, 1973. If the number of shares issued and outstanding on August 31, 1974 is used, the comparable figure is somewhat less than $7.↩
8. Moreover, we doubt that Pactum, Ltd., RAVCO, and Barbara Vose would have intentionally overpaid for the stock in light of their fiduciary duties under Oklahoma law. See generally Pipkin v. Pipkin,393 P.2d 534, 537↩ (Okla. 1964) (the standard of care and skill required is that of a man of ordinary prudence in dealing with his own property). 9. Although not influencing our decision as to these third-party sales, we note that respondent stipulated an engineering and valuation report, dated June 22, 1976, by one of his valuation engineers, which stated that the sales during 1972 and 1973 were "arms length sales" and concluded that the value of a share of Sirloin common stock was $5 during 1972 and 1973. Respondent did not object to the use of this report as evidence (although he reserved the right to object to stipulated matter on the grounds of materiality and relevancy) and did not call the valuation engineer as a witness. He merely asserted in his reply brief that he "has not stipulated that he [the valuation engineer] is * * * an expert witness in the area of valuation of closely-held corporations." Such an assertion is, to say the least, disingenuous.↩
10. H. H. Champlin was the sole shareholder of Dollars, Inc., and, together with Douglas L. Champlin, owned all of the shares of Sir Sirloin, Inc. ↩
11. Additionally, we note that Keele was the president of Sirloin Stockade of Missouri, Inc., and one Bill S. Milliren (who was also the executive vice-president and secretary of Sirloin) was its secretary. There is at least some doubt as to whether this was an arm's-length valuation.↩
12. The value of a Sirloin share of common stock at the time the deal was made was $6.02 (p. 12, supra↩). Although the record does not include the reason for the drop in value, it presumably was the result of a lower value for the Lucky shares at the time of the closing of that transaction.