T.C. Memo. 2002-145


UNITED STATES TAX COURT


LEO J. POLACK, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12739-98.          Filed June 10, 2002.


<u>Barry A. O'Neil</u> and <u>Glenn R. Kessel</u>, for petitioner.

<u>Blaine C. Holiday</u> and <u>David Zoss</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined a deficiency of $442,200 in petitioner's Federal gift tax for the taxable year 1992.  After concessions, the sole issue for decision is the valuation of petitioner's gifts of shares of stock in Zip Sort, Inc., that he made to his children on December 31, 1992.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact are incorporated herein by this reference. Leo J. Polack (petitioner) was a resident of Minnesota when he filed the petition in this case.

Background

Zip Sort, Inc. (ZSI), was incorporated on July 24, 1987, and petitioner purchased ZSI in August 1987. During 1987, ZSI employed approximately 10 people and had 30 to 40 regular customers. ZSI engaged in the trade or business of printing and preparing pieces of bulk mail for clients and, to that end, operated lettershop and presorting divisions.

The lettershop division processed mailings for ZSI's clients, providing services ranging from printing and folding materials to stuffing and addressing envelopes. In 1991, petitioner purchased Stedman Enterprises, an unprofitable printing company, to bolster ZSI's lettershop division and as a backup in the event of an imminent strike.

The presorting division sorted the pieces of bulk mail according to U.S. Postal Service (Postal Service) criteria in order to take advantage of Postal Service refund programs. Initially, ZSI employees manually sorted the pieces of bulk mail, and the Postal Service discounted the postage for each piece of mail in each of ZSI's presorted mailings by 4 cents (presorting

discount).  ZSI typically shared the presorting discount with its customers such that ZSI would refund, or reduce, fees paid to ZSI by 2 cents.  Despite receiving this presorting discount, the presorting division historically maintained a very low profit margin; high volume was essential to the success of the presorting division.  Through 1990, ZSI's overall performance was stagnant, and petitioner attempted to sell ZSI's unprofitable presorting division but was unsuccessful.

In 1990, the Postal Service instituted an additional refund program wherein the Postal Service began refunding to participants 0.9 cent for each piece of presorted bulk mail that met certain Postal Service criteria (the value-added refund, or VAR, program).  One criterion of the VAR program was that the participant place bar codes on each piece of mail so that the Postal Service could use optical scanners to economize its operations.  In June 1990, ZSI entered into a lease[1] for a multiline optical character reader (MLOCR) which automated its presorting division, printed bar codes on pieces of mail, and sorted the pieces by ZIP Code.

Although ZSI began leasing the MLOCR in 1990, ZSI did not yet qualify for participation in the VAR program; in 1990, ZSI

---

[1]ZSI leased the multiline optical character reader (MLOCR) either because MLOCRs were too expensive to purchase (between $400,000 and $1,000,000) or because, for security reasons, the manufacturer would not sell a MLOCR to ZSI.

had difficulty developing customers to support the continued lease of the MLOCR. In the latter part of 1990, petitioner entered into discussions with a majority shareholder of Postal Automation, one of ZSI's competitors, regarding the divestiture of their respective presorting divisions. Both parties were anxious to sell their respective presorting divisions. Petitioner eventually agreed to purchase Postal Automation's presorting division for approximately $200,000 to $250,000 and a share of ZSI's profits for the following 2 years. Petitioner's bank financed the purchase and additional operating costs for ZSI in exchange for security interests in petitioner's home or farm and in a printing company petitioner owned.

In 1991, ZSI first qualified to participate in the VAR program. ZSI continued to receive the 4 cents presorting discount and began receiving the 0.9 cent value-added refund (VAR income or VARI). During 1991, ZSI continued to split the presorting discount with its customers but was able to retain all of the VARI it received, and the presorting division had its first profitable year. By 1992, however, some of ZSI's customers had learned of the VAR program, and they demanded a share of the VARI ZSI received. ZSI complied, for fear of losing those customers,[2] and shared the VARI either by directly paying a

_____

[2]As of the valuation date, ZSI had at least five primary competitors of relatively equivalent size, and there were few
(continued...)

portion of the VARI to the customer or by reducing that customer's service fees. In 1992, ZSI transferred to its customers, by direct payment or reduction in fees, $117,426, or 10.24 percent, of the $1,147,100 in gross VARI it received; ZSI retained the other $1,029,674, or 89.76 percent, of the gross VARI received.

Although ZSI was profitable in 1991 and 1992, petitioner expected ZSI would have to share with its customers substantially more of the VARI in future years. Petitioner feared that the presorting division's low profit margin and tough competition, combined with a further reduction in retained VARI, would strain ZSI's finances.

Gifts of ZSI Stock

Immediately prior to the gifts at issue herein, ZSI's stock was held as follows:

---

[2](...continued)
barriers to entry into ZSI's industry. In 1992, ZSI purchased a competing company with small profits for $100,000 to $125,000 and procured a covenant not to compete from the seller. By the end of 1992, ZSI owned at least three current covenants not to compete.

| Owner of shares | Voting shares | Nonvoting shares[3] |
|---|---|---|
| Leo J. Polack | 6,522 | 1,193,479 |
| Dana Rhoads | 869 | 159,130 |
| Lora Oberle | 870 | 159,131 |
| Gregory Polack | 870 | 159,131 |
| Sherry Tollefson | 869 | 159,130 |
| Patricia Kostuch | 869 | 159,130 |
| Total | 10,869 | 1,989,131 |

Dana Rhoads was the president of ZSI, and Lora Oberle, Gregory Polack, Sherry Tollefson, and Patricia Kostuch are petitioner's four children.

On December 31, 1992, petitioner gifted 260,000 of his nonvoting shares of stock in ZSI to each of his four children, and immediately thereafter, ZSI's stock was held as follows:

| Owner of shares | Voting shares | Nonvoting shares |
|---|---|---|
| Leo J. Polack | 6,522 | 153,479 |
| Dana Rhoads | 869 | 159,130 |
| Lora Oberle | 870 | 419,131 |
| Gregory Polack | 870 | 419,131 |
| Sherry Tollefson | 869 | 419,130 |
| Patricia Kostuch | 869 | 419,130 |
| Total | 10,869 | 1,989,131 |

Petitioner retained an appraisal company to appraise the value of the gifted shares of stock in ZSI as of the date of the gifts, December 31, 1992. Gerald Gray, an appraiser with that company, prepared an appraisal report and concluded that, on the

---

[3]On Dec. 30, 1992, petitioner recapitalized ZSI and thereby created the two classes of stock. The only difference between the classes of stock was the presence of voting rights.

valuation date, ZSI was worth $2 million, and the 1,040,000 gifted nonvoting common shares of stock in ZSI were worth 50 cents each. Petitioner timely filed his Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, and therein reported cumulative annual gifts of $520,000 in accordance with the appraisal report.

Following an examination, respondent determined that, on the valuation date, the 1,040,000 gifted nonvoting common shares of stock in ZSI were worth $1.65 each and issued a notice of deficiency to that effect. Just prior to trial, however, respondent retained an appraisal company to appraise the value of the gifted shares of stock in ZSI as of the valuation date. Brad Cashion, an appraiser with that company, toured ZSI's facilities and interviewed Mr. Rhoads. Mr. Rhoads was primarily responsible for ZSI's daily operations and for coordination of those operations with the Postal Service. Mr. Cashion prepared an appraisal report that concluded that, as of the valuation date, ZSI was worth $3,800,000--comprising $3,630,000 as an operating company and $170,000[4] in nonoperating assets--and that the 1,040,000 gifted nonvoting common shares of stock in ZSI were

_____

[4]This nonoperating asset was stock listed on ZSI's balance sheet at $170,316.

worth 90 cents each.  At trial, however, respondent conceded that the shares at issue were worth 88 cents each.[5]

OPINION

The only issue for decision is the value of the 1,040,000 gifted shares of stock in ZSI on December 31, 1992.  In deciding the value of gifted shares of stock, we look to "the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts."  Sec. 25.2512-1, Gift Tax Regs.[6]

Although we consider all the relevant facts and circumstances in valuing gifted property, the value of a closely held business is best ascertained by relying on actual arm's-length sales or transfers, if any, of the stock within a reasonable period of the valuation date.  Estate of Fitts v. Commissioner, 237 F.2d 729, 731 (8th Cir. 1956), affg. T.C. Memo. 1955-269;  Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982).  The record contains no evidence of a sale or transfer of

---

[5]This concession was mathematical in nature and not in substance different from Mr. Cashion's reported conclusion that the shares were worth 90 cents each.

[6]Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the taxable year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

stock in ZSI other than that at issue; this highly probative factor therefore is unavailable for our analysis.

Another factor highly probative of a company's value is the value placed on an arm's-length sale or transfer of shares of stock in a company similar to the company at issue, such sale or transfer taking place within a reasonable period of the valuation date. Sec. 2031(b); Rev. Rul. 59-60, 1959-1 C.B. 237, 242. Both parties identified other companies operating in this industry, but the parties either distinguished ZSI from those companies or did not provide us with data regarding any arm's-length sale or transfer. Although petitioner and/or ZSI purchased certain assets and divisions of competing companies, we do not have sufficient data to consider whether those "sales" or "transfers" are probative of ZSI's value. This factor is unavailable for our analysis.

In the absence of arm's-length sales or transfers of stock in the subject company or in comparable companies, we have generally considered a number of other factors affecting the fair market value of the company and the gifted shares of stock, including: The nature of the business and the history of the enterprise from its inception; the economic outlook in general and the condition and outlook of the specific industry in particular; the book value of the stock and the financial condition of the business; the earning capacity of the company;

the dividend-paying capacity; whether or not the enterprise has goodwill or other intangible value; and the size of the block of stock to be valued. Rev. Rul. 59-60, 1959-1 C.B. at 238-239.

Both experts considered these and other factors in examining ZSI and in constructing their respective appraised value.[7] Nevertheless, petitioner's analysis of the factors and of ZSI's worth yielded a value nearly half that which respondent's appraisal yielded.[8] The parties identified, and the Court

---

[7]The Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 726, added sec. 7491(a), which is applicable to court proceedings arising in connection with examinations commencing after July 22, 1998. Under sec. 7491, Congress requires the burden of proof to be placed on the Commissioner, subject to certain limitations, where a taxpayer introduces credible evidence with respect to factual issues relevant to ascertaining the taxpayer's liability for tax. In the instant case, petitioners have not raised the application of this provision or otherwise argued that respondent bears the burden of proof in this case. Further, the record indicates that the Commissioner's examination commenced before July 22, 1998. In any event, both parties adduced testimony and offered exhibits in support of their respective positions, and the evidence so introduced, though sparse, was not equally compelling. Accordingly, we have based our conclusion upon the preponderance of the evidence and not upon any allocation of the burden of proof. See Estate of Harper v. Commissioner, T.C. Memo. 2002-121.

[8]Petitioner contends we should accept his expert's testimony because his expert is significantly more experienced than respondent's expert. As our discussion indicates, our conclusion turns on factual disputes and reflects our finding that petitioner's conclusions regarding disputed factual issues are not grounded on credible evidence. An expert, no matter how skilled, can only work with the factual record he is given by his client or obtains through his own efforts. In this case, petitioner's expert relied primarily on petitioner's unsupported opinion regarding the disputed factual matters.

discovered, a number of differences in the parties' analyses contributing to the difference in value.  On brief, petitioner addressed only the differences in the parties' treatments of (1) projected VARI, (2) projected annual capital expenditures, and (3) a nonoperating asset.

I.   VARI

Of the three items the treatment of which the parties dispute, the one likely to have the most impact on ZSI's value is the extent to which ZSI will retain the VARI it receives.

Respondent projected gross VARI to equal 18 percent of gross sales for each projected year,[9] or $1,620,000 for 1993. Respondent's projection was based on ZSI's historical amounts of gross VARI earned, petitioner's projected gross sales, and the parties' consensus that gross VARI varies directly with gross sales.  Respondent then projected, based on Mr. Rhoads's statements, that ZSI would retain 50 percent of the gross VARI for each projected year.

On the other hand, petitioner projected that ZSI would retain only $350,000 of gross VARI for 1993,[10] without projecting what gross VARI would be, and that ZSI would retain amounts proportionate to gross sales thereafter.  Petitioner argues that

[9]Roughly 70 to 75 percent of all sales qualified for the VAR program.

[10]Petitioner's projection equates to 21.60 percent of respondent's projected gross VARI.  By contrast, respondent projected ZSI would retain $810,000, or 50 percent, of respondent's projected gross VARI.

he was the most knowledgeable person regarding VARI and that respondent's projection, based on an interview with Mr. Rhoads, is therefore erroneous. We disagree for several reasons.

First, respondent's reliance on Mr. Rhoads's statements was not improper. Mr. Rhoads had daily contact with ZSI and was intimately involved with the presorting division's operations; we do not think it improbable that Mr. Rhoads was aware of those factors impacting the presorting division's profitability, not the least of which was the amount of retained VARI.

Second, respondent's projection coincides with the most objective and reliable evidence in the record--the presorting discount. ZSI saved 4 cents per piece of mail under the presorting discount program and consistently has been able to retain the benefits from 50 percent of that discount. We have seen no evidence to suggest the apportionment of the presorting discount is distinguishable from the apportionment of the VARI.

Third, and most importantly, petitioner's projection is unreliable and lacks probative value.[11] Petitioner's bald projection of $350,000 does not appear to be based on any evidence or knowledge personal to petitioner. Although petitioner generally dealt with ZSI's creditors and financial

---

[11]At trial, petitioner testified that he had estimated ZSI would retain anywhere from 25 percent to 35 percent of VARI but offered the Court no facts on which to evaluate the reasonableness of his estimates.

arrangements personally, petitioner failed to show how his involvement with ZSI's finances imbued him with the ability to set a dollar value on retained VARI without first considering any financial records or evaluating ZSI's customer base. If petitioner did consider any information in making his projections or if petitioner's expert examined that information in petitioner's stead, they have not so asserted, nor have they identified the information.

Respondent's projections of gross and retained VARI are reliable and probative of ZSI's value, and petitioner has not introduced evidence, other than his unsupported guess, to show otherwise. We therefore accept respondent's projections regarding VARI.

## II. Capital Expenditures

The second item we consider is ZSI's projected capital expenditures. Respondent projected ZSI would make capital expenditures of $100,000, $125,000, $100,000, $100,000, and $100,000 for the years 1993 through 1997, respectively, and that those outlays would be sufficient to replace existing equipment and to purchase new equipment as necessary. Petitioner contends that respondent's projections fail to account for expenses of the presorting division and that respondent's projections are inconsistent with ZSI's history of expenses, projected level of growth, and projected depreciation. Petitioner instead projected

ZSI would make capital expenditures of $200,000 in years 1993 through 1995 and of $150,000 for each year thereafter. As discussed below, petitioner's arguments and projections do not rest on credible evidence, and we are persuaded that respondent's projections are more reliable. We therefore accept respondent's projections regarding capital expenditures.

As near as we can tell, petitioner's argument that respondent failed to account for the "expenditures necessary for the multi-line optical readers or any expenses related to the bar-coding function of Zip Sort's business"; i.e., the presorting division, stems from a misunderstanding between respondent's expert and Mr. Rhoads. Mr. Rhoads told Mr. Cashion that $100,000 would be more than enough for expenses in 1993; Mr. Rhoads intended that remark to relate only to the lettershop division, but Mr. Cashion interpreted that remark as relating to the lettershop division and the presorting division. Nevertheless, because there is no evidence (1) that the presorting division owned, or was likely to purchase for use in its business, any capital asset of substantial value[12] or (2) that expenses related

---

[12]In holding that petitioner's argument fails, we note that the MLOCR, the only asset we know to be used in the presorting division, was leased rather than owned, and both parties separately accounted for costs associated with equipment leases in their projections. Without any evidence that the presorting division included other assets, we can only assume that respondent's projections did, in fact, account for the presorting division.

to the MLOCR or any expenses related to any other portion of the presorting division would be capital in nature, this misunderstanding does not persuade us that ZSI would incur capital expenditures with regard to the presorting division.

Likewise, petitioner's arguments that respondent's projections of capital expenditures are inconsistent with ZSI's history of expenses, projected level of growth, and projected depreciation are not supported by evidence. Specifically, petitioner alleged that respondent's projections (1) improperly reduce ZSI's assets' book values during a period of corporate growth; (2) improperly depreciate assets not yet acquired; and (3) fail to recognize that proper appraisal methodology would project a growing company's capital expenditures to be relatively equal to its depreciation, in order to maintain the asset base. As discussed below, we disagree with petitioner.

Petitioner has not directed us to any authority that a decline in a corporation's assets' book values is irreconcilable with that corporation's growth. ZSI's growth is tied more closely to the service fees, the presorting discounts, and the value-added refunds it generates than to its assets' book values.[13] We therefore are not persuaded by petitioner's

---

[13]For 1993 and 1994, it appears that respondent projected ZSI's assets' cumulative book value to increase, as ZSI's capital expenditures are projected to exceed its depreciation allowances.

argument that respondent improperly reduced ZSI's assets' book values.  We also are unpersuaded by petitioner's assertion that respondent improperly depreciated assets not yet acquired.  The record does not support petitioner's assertion.  At no point do respondent's projections anticipate ZSI's accumulated depreciation exceeding the cumulative costs of ZSI's capital assets.  We note that although respondent projected annual depreciation to exceed annual capital expenditures in 1995, 1996, and 1997, ZSI's assets' book values were sufficient to accommodate that depreciation.  Petitioner has not supplied us with any historical cost or depreciation information regarding assets that ZSI held on the valuation date, or that it could be expected to hold thereafter, and, because of this dearth of information, petitioner's argument and projections on this point lack any evidentiary foundation.

Finally, in arguing that proper appraisal methodology "usually" calls for ZSI's capital expenditures to be relatively equal to ZSI's depreciation, petitioner ignored the reality of ZSI's situation.  Mr. Rhoads was a frugal manager and president, and he ran ZSI's operations so as to keep costs at a minimum.  Most of ZSI's repair work was done in-house, and the machines were observed and maintained around the clock to ensure their continued operation.  Mr. Rhoads cannibalized machines to keep other machines operational for as long as possible, and he

testified that he would be hard pressed to spend $50,000 each year on capital expenditures--that $100,000 would replace all of the lettershop division's assets.

Respondent's projections were based on Mr. Rhoads's statements and the above operational history, and we find respondent's projections reliable and probative of ZSI's value. On the other hand, the record does not support petitioner's arguments or projections, and petitioner has failed to persuade us that ZSI's future capital expenditures will be tailored to match ZSI's book depreciation. We therefore accept respondent's projections regarding capital expenditures.

III. Nonoperating Asset

The last item we consider is the nonoperating asset held by ZSI and listed on ZSI's 1992 balance sheet at a value of $170,316. Respondent included the nonoperating asset's value (rounded to $170,000) in his final valuation of ZSI. We surmise from the single paragraph petitioner devoted to this issue that although petitioner initially omitted the nonoperating asset's value from his valuation analysis, he now concedes that the value should have been included but argues that the value of the nonoperating asset must be offset by a $150,000 debt owed by ZSI to a stockholder. Petitioner's argument is rooted in petitioner's testimony that the $150,000 debt was payable by ZSI to petitioner and that during 1992 ZSI purchased the nonoperating

asset for petitioner in satisfaction of the debt.  Petitioner testified that although both items appeared on ZSI's 1992 financial records, neither item should have so appeared.

Petitioner's testimony is not supported by the record. Petitioner did not introduce any evidence, other than his own testimony, to show that he was the stockholder to whom ZSI's debt was payable or that ZSI purchased the nonoperating asset in satisfaction of the debt.  We do not accept petitioner's completely uncorroborated testimony as persuasive proof that respondent improperly included the nonoperating asset in calculating ZSI's value, in the face of the evidence that the asset was listed on ZSI's balance sheet at a value approximating $170,000.  Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Conclusion

Petitioner disputed a number of respondent's assumptions in valuing ZSI for purposes of Federal gift tax, but we are persuaded that respondent's valuation is supported by the evidence.  We therefore conclude that ZSI's value on the valuation date was 88 cents per share, as respondent's expert calculated.

We have considered all of petitioner's arguments for a different result, and, to the extent not discussed herein, we find them moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.