MINETTE HERMELIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent. VICTOR M. HERMELIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Hermelin v. Commissioner
Docket Nos. 8110-74, 8116-74.[1]
United States Tax Court
T.C. Memo 1977-94; 1977 Tax Ct. Memo LEXIS 348; 36 T.C.M. (CCH) 426; T.C.M. (RIA) 770094; March 31, 1977, Filed Merle L. Silverstein,Jack M. Mazur,Robert D. Grossman, Jr., for the petitioners. James Cannon,Robert P. Edler, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies in petitioners' gift tax liability for the calendar quarter ending June 30, 1971: Victor M. Hermelin
$105,628.75
Minette Hermelin
100,641.25
The only issue for decision is the fair market value of 42 shares of common stock of K-V Pharmacal Company as of June 2, 1971, the date petitioners transferred the shares to three trusts for the benefit of their three children. FINDINGS OF FACT Certain facts have been stipulated and are found accordingly. *349 Petitioners Victor M. and Minette Hermelin, husband and wife, resided in St. Louis, Missouri, when they filed their petition. Minette Hermelin is a party solely by virtue of agreeing to join in the gift of K-V Pharmacal stock to trusts for their children and submitting a gift tax return in relation to that gift. When we refer to petitioner, we will be referring to Victor M. Hermelin. In 1939 petitioner helped organize a Missouri company devoted to drug manufacturing and development. Shortly thereafter the company adopted the name K-V Pharmacal Company ("K-V") and petitioner became its sole shareholder. In its early years, K-V's primary source of income was the manufacture and sale of drugs under private labels. In 1955 petitioner developed a sustained release process which involved coating a drug in such a manner that it would dissolve at a constant rate over an extended period of time. Partly as a consequence of this development, K-V reoriented its operations to emphasize contract manufacturing under which customers supplied the drugs that K-V converted into a variety of final dosage forms. In 1971, 72 percent of K-V's gross revenue came from pharmaceutical company customers *350 who wanted their products converted into sustained release form. Over the years K-V established an enviable earnings record, although it never paid any dividends. K-V's consolidated income statements [2] for its fiscal years ending March 31, 1967 through 1971 chronicle the company's prosperity: Year Ended March 31st
1967
1968
1969
1970
1971
Sales
$1,978,476
$2,461,248
$2,800,269
$3,932,285
$4,989,205
Operating income
275,885
411,340
329,844
876,369
989,675
Investment income
16,417
21,521
22,379
47,640
70,648
Income before
292,302
432,861
352,223
924,009
1,060,323
taxes
Net income
166,284
235,674
185,996
476,664
555,014
Per share [3]
475.10
673.35
531.42
1,361.90
1,585.75
The impetus for this growth had originally come from petitioner and the patents he had obtained in the 1950's in *351 relation to his sustained release process. However, by the late 1960's, after establishing a research and development staff of five people, K-V had grown less dependent on petitioner for new product development. One of the drugs which K-V processed was used for treating diabetes. Diabetes is a malady resulting from the body's inability to metabolize sugar due to the pancreas' failure to produce insulin. The first successful treatment for diabetes was insulin injections. Subsequently oral medications were developed. The first oral drugs bore the generic name of sulfonylureas, and they acted by stimulating the pancreas' insulin production. Later a second group of oral drugs, called biguinides, was developed. These drugs stimulated the body's muscles to consume the excess sugar. Revlon, Inc. had developed one type of biguinide, sold under the brand name of DBI as a tablet and DBI-TD as a capsule. DBI-TD differed from regular DBI in that DBI-TD dissolved at a given rate over an extended period of time. This attribute made DBI-TD commercially popular. K-V had employed its sustained release expertise to develop the process by which regular DBI was converted into DBI-TD and was *352 the only manufacturer of DBI in a sustained release form in the United States. By early 1971, the subsidiary of Revlon, Inc. marketing DBI-TD, USV Pharmaceutical Company ("USV"), was K-V's largest customer, accounting for 38 percent of K-V's gross revenues. As a result of the success of DBI-TD and K-V's other products, K-V in the early months of 1971 began to consider the possibility of selling a minority portion of its shares to outside investors. As part of this plan, a new corporation was to be formed in Delaware to be known as K-V Pharmaceutical Company ("Pharmaceutical") and K-V was merged into the new corporation. The merger contemplated an exchange of one share of K-V for 2,000 shares of Pharmaceutical. Beginning in April 1971, representatives of K-V began meeting with members of Reinholdt & Gardner and the Fisher Corporation, two St. Louis underwriting firms who agreed to manage the public offering of Pharmaceutical's stock. On May 7, 1971, petitioner, in his capacities as president of K-V and as an individual, and the two underwriting firms executed a letter of intent in which they outlined their understanding of the terms of the public offering. The parties contemplated *353 an initial offering price of $10 to $12 per share of Pharmaceutical. Events, however, did not proceed smoothly. On May 20, 1971, the Wall Street Journal published preliminary findings of a research study investigating diabetes medications. Shortly before the Journal's article, a drug trade publication, FDC Reports, circulated similar news. The research study's tentative findings indicated that DBI-TD, as well as the sulfonylureas drugs, were no more successful in treating diabetes than diet and insulin treatment and had the disadvantage of increasing the likelihood of heart attacks. This news had an immediate adverse effect on the stock of Revlon, Inc., whose subsidiary, USV, actually marketed DBI-TD. On May 19, 1971, Revlon's stock fell 5 7/8 points to 68 3/8, and trading in Revlon stock was suspended. On May 24, 1971, the Wall Street Journal reported that the Food and Drug Administration would in all likelihood notify physicians of the research study's findings, which in turn would cause a drastic curtailment in DBI-TD sales. By June 2, 1971, Revlon's stock was back up to 71 1/2 per share. USV cut back its DBI-TD orders from K-V at about the time of this *354 news break. A major reason for USV's decision was this adverse news. USV, however, based its decision in part on reasons unrelated to this news. USV had earlier moved to new packaging quarters and had built up a sizable DBI-TD inventory prior to this move and therefore did not need to reorder during this period of 1971. In addition, USV was negotiating the sale of the right to use the DBI trademark in the United States to another company, CIBA-Geigy, and so had less need to continue a DBI-TD inventory at a high level. Under the terms of an earlier antitrust consent degree providing for the merger of CIBA with Geigy, the USV-CIBA-Geigy deal required Department of Justice approval. The uncertainty surrounding such approval also negatively affected USV's DBI-TD orders. The overall effect of these factors was that K-V's sales of DBI-TD for the first half of its 1971 fiscal year showed a precipitous decline over prior years. By late summer and early fall, K-V's prospects for the future brightened. Independent medical experts soundly criticized the research study's methodology in relation to DBI. In response to this criticism, the FDA ultimately did not require that DBI-TD be *355 labeled to reflect the findings of the research study. By August 26, 1971, CIBA-Geigy received Department of Justice approval to acquire USV's rights to the trademark DBI and began placing orders with K-V. Additionally, USV decided to continue to produce the same drug under a new brand name and began ordering from K-V. In June 1971, before these favorable events occurred, there were 350 shares of K-V stock outstanding, all of which petitioner owned. On June 2, 1971 he made three gifts of 14 shares each to three trusts for the benefit of his three children. Fifteen days later, on June 17, 1971, the planned reorganization occurred, with K-V merging into Pharmaceutical. As part of the reorganization, 2,000 shares of Pharmaceutical were exchanged for each share of K-V. With the advent of the late summer's favorable events, Pharmaceutical and the underwriters decided to continue with their planned public offering. By the early fall the process of registering with the Securities and Exchange Commission those shares of stock that were to be sold publicly was completed. On September 14, 1971, the two underwriting firms agreed to purchase from petitioner 210,000 of the total of 700,000 *356 outstanding shares of Pharmaceutical at a price of $14.26 a share. The underwriters then sold the stock to the public at $15.50 a share. Each petitioner filed a gift tax return for the quarter ending June 1971 reporting their gift of 42 shares of K-V stock to three trusts for their children. Each reported a value per share at the date of the gift of $5,405.21 (which was equivalent to a value of $2.70 per share of Pharmaceutical stock). Respondent in his statutory notice determined that per share value of K-V stock on June 2, 1971 was $25,860 (equivalent to $12.93 per share of Pharmaceutical stock). OPINION On June 2, 1971, petitioners made a gift of 42 shares of stock in K-V Pharmacal Corporation, a closely held corporation, to three trusts for their children. The sole issue before us is the value of these 42 shares of stock on the date of the gift. Section 2512(a)[4] provides: "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." In a case such as the present one where there is no public market for the stock at *357 the date of the gift, the regulations under this section provide: (f) * * * the fair market value is to be determined by taking the following factors into consideration: * * * (2) In the case of shares of stock, the company's net worth, prospective earning power and dividend paying capacity, and other relevant factors. Some of the "other relevant factors" referred to in * * * [subparagraph 2] of this paragraph are: the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * * Section 25.2512-2(b), Gift Tax Regs. Abstract mathematical formulas usually cannot capture the rich diversity of factors inherent in any particular *358 valuation situation. See Rev. Rul. 59-60, 1959-1 C.B. 237, 238. Petitioner at trial argued in favor of a value of $9,500 a share of K-V stock. In support of this figure, he submitted the report and offered the testimony of an expert witness, Dr. Elgin Groseclose. We found Groseclose to have an extensive background in the valuation of closely held stock. We also found his valuation conclusion to be a function of thorough analysis. In coming to his figure, Groseclose not only visited the site of the company, but also analyzed its financial statements for the five fiscal years ending in 1971 and considered the general condition of the drug industry. Although he considered K-V's impressive earnings record, Groseclose concluded that other significant factors acted to lessen the value of these shares. First he recognized that the 42 shares amounted to only 12 percent of K-V's outstanding stock and treated these shares as if they were all held by one entity. Thus the holder of this small interest could do little to change K-V's policy of not paying dividends. *359 Nor could a minority shareholder realistically expect to recoup his investment via resale of his shares since K-V stock was not registered, a situation a minority shareholder would be powerless to alter. Groseclose also looked to the company's customer base and found its heavy dependence on the patronage of USV a negative factor. Then he looked to K-V's situation on June 2, 1971, the date of the gift, and found K-V still greatly enmeshed in the fall-out of the adverse DBI research study results. He also thought that K-V was too dependent upon one person, Victor M. Hermelin, for product development. In light of these and other factors, he concluded that $9,500 a share of K-V stock, equivalent to $4.75 a share of Pharmaceutical stock, was appropriate. He thought that the higher per share figure obtained in Pharmaceutical's September public offering was in no way inconsistent with his June finding, since by September the DBI brouhaha had subsided and the Pharmaceutical stock was registered and therefore more easily transferred than the 42 shares of K-V stock. Respondent at trial lowered his valuation figure to $22,800 per share of K-V stock. Respondent also presented an expert, *360 Boyd Goff, to support his valuation figure. Goff has had some prior valuation and securities experience. Although we found his report of some assistance, we found Goff to be less than totally satisfactory as a witness. Many of his comments were either factually incorrect or internally inconsistent. We also found his report premised on too many imponderables. His methodology to a large degree relied on a comparison between K-V and a number of small publicly traded drug companies. Goff relied upon a statistical relationship between the book value and the projected rate of earnings of these small drug companies and the price of their stock and applied this relationship to K-V. Goff also based his analysis upon 700,000 shares outstanding, rather than the 350 shares of K-V stock actually outstanding on June 2, 1971. Using this analysis Goff determined that the K-V stock, if publicly traded, would have a value of $15.20 per share (based on 700,000 shares outstanding). He then determined that if K-V's stock remained closely held, it would be worth only $7.60 per share. He next analyzed the overall completion rate of public offerings in 1971 and found that the likelihood of consummation *361 was 67 percent. Given that K-V had not yet completed the process of going public, Goff concluded that an investor would pay the probable publicly traded figure of $15.20 (multiplied by the odds of going public which were 67 percent) plus the closely held value of $7.60 per share (multiplied by the odds of remaining unregistered which were 33 percent) or $12.70 per share. Finally Goff reduced this figure by the costs of registration to get a final fair market value of $11.40 (all of the above being based on 700,000 shares outstanding). He then converted this figure to $22,800 per share, based on the actual number of shares outstanding, namely 350. After thorough scrutiny of the testimony and reports of the experts and the other exhibits, we conclude that one share of K-V stock on June 2, 1971 possessed a value of $12,000, based on 350 shares outstanding. We do not consider it helpful to discuss the various cases cited by the parties since each valuation case turns on its own set of facts. Messing v. Commissioner,48 T.C. 502, 512 (1967). We instead have looked closely at the reasoning and methodology of each expert. Considering first the testimony of petitioner's *362 expert, we think that Groseclose erred by emphasizing too heavily the role Victor Hermelin played in K-V's current successes and neglecting K-V's total research capabilities. We also found his testimony and report to be somewhat lacking in specificity. We think, however, that respondent's expert's conclusion incorporated more serious flaws. For example, Goff did not weigh sufficiently the considerable negative impact which the late May Wall Street Journal reports would have had on either the value of K-V stock if K-V remained closely held or on the likelihood of K-V's going public. We therefore found his value for K-V stock if closely held to be too high and his general estimate of the odds of a company actually completing the process of going public to be inapplicable to K-V's more precarious situation. We further consider the precipitous decline in the market price of Revlon stock resulting from the publication of the adverse research study results to be only a mild hint of what would have happened to the stock of a specialty company only recently gone public, such as K-V, if K-V had been publicly traded as of June 2, 1971. We also do not think that Goff gave adequate attention *363 in his analysis to the minority position of these 42 shares. Based upon a thorough study of the record and giving appropriate weight to these and other considerations, we conclude that a share of K-V stock on June 2, 1971 had a fair market value of $12,000. Decisions will be entered under Rule 155. Footnotes
1. These cases were consolidated at trial for purposes of trial, briefing and opinion.↩
2. Altough K-V's consolidated income statements summarize the operating results of several entities, the only sizable entity was K-V itself. ↩
3. Prior to 1971 K-V had 200 shares outstanding. In 1971 K-V issued an additional 150 shares. For ease of comparison, earnings-per share are based upon 350 shares in each year.↩
4. All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩