## STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Lora Jarrett Johnstone,**
**Respondent Below, Petitioner**

vs)  No. 13-0928 (Kanawha County 08-D-2104)

**Charles M. Johnstone, II,**
**Petitioner Below, Respondent**

**FILED**

**June 17, 2014**
**released at 3:00 p.m.**
**RORY L. PERRY II, CLERK**
**SUPREME COURT OF APPEALS**
**OF WEST VIRGINIA**

### MEMORANDUM DECISION

Petitioner Lora Jarrett Johnstone, by her counsel Mark A. Swartz and Allyson H. Griffith, appeals the February 20, 2013, order of the Circuit Court of Kanawha County that affirmed several orders by the Family Court of Kanawha County pertaining to the equitable distribution of the parties' marital estate. Respondent Charles M. Johnstone, II, appearing by his counsel James Wilson Douglas, filed a response. Petitioner filed a reply.

The Court has considered the parties' briefs, oral arguments, and the record on appeal, and finds no substantial question of law and no prejudicial error. A memorandum decision affirming the circuit court's order is therefore appropriate under Rule 21 of the Rules of Appellate Procedure.

The parties were married in 1989 and separated on November 20, 2008. The parties subsequently filed for divorce, which the family court granted on grounds of irreconcilable differences.

Petitioner-wife assigns as error two rulings by the family court, both of which pertain to the equitable distribution of marital property. The circuit court affirmed both rulings. West Virginia Code § 51–2A–14(c) [2005] provides that "[t]he circuit court shall review the findings of fact made by the family court judge under the clearly erroneous standard and shall review the application of law to the facts under an abuse of discretion standard." Likewise,

> In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*.

Syllabus, *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004). We now examine the Petitioner's two assignments of error.

Petitioner-wife's first assignment of error is that the family court erred in calculating the marital value of Respondent-husband's law practice. Petitioner's expert testified that it was his

1

opinion that the law practice was worth $707,000 on December 31, 2008. Respondent's expert testified that the law practice was worth $149,200 on November 30, 2008. The family court judge assessed the approaches of the two experts and rejected the Petitioner's expert's approach. The family court judge found that in valuing the practice, Petitioner's expert had failed to apply a sound valuation method, in accordance with this Court's decision in *May v. May*, 214 W.Va. 394, 589 S.E.2d 536 (2003), and had commingled incompatible data types from different dates. Conversely, the family court judge found that Respondent's expert had followed the standards required by *May*, and had properly delineated the data to reach reasonable valuation figures. Accordingly, the family court assigned a marital value to the law practice of $149,200. The circuit court found no error with the family court's decision and affirmed.

After consideration of the record, we find no error on this point. Both experts submitted detailed valuation reports to the family court. Both experts testified and were cross examined before the family court, and the family court was able to listen and assess the experts first hand. The family court's order provided a thorough and exhaustive evaluation of the merits and flaws of the parties' respective experts, and came to the conclusion that Respondent-husband's expert provided a more accurate value of the law practice at the time of the parties' separation on November 20, 2008. On this record, we must affirm the circuit court's decision affirming the family court's order regarding the marital value of the Respondent's law practice.

Petitioner-wife's second assignment of error is that the family court erred in calculating the marital value of an office building owned by a corporation that was in turn owned by Respondent-husband. The parties do not dispute that the corporation and the office building it owned are marital assets. At the time of the parties' separation, the office building was encumbered by a $153,362.45 mortgage debt. After the parties' separation in November 2008, but before the divorce was finalized, the corporation continued to receive at least $72,871.20 in rental income. The rent was applied to reduce the mortgage to $80,491.25 by August 2010, when a hearing was held before the family court. The family court established that the debt on the office building was $153,362.45 on the day of the parties' separation. The circuit court affirmed this determination.

Petitioner contends that she is entitled, as her share of marital property, to either half of the rental income that was received by the corporation after the parties' separation, or half of the reduction in debt and simultaneous increase in value of the office building as of August 2010. In other words, Petitioner contends the family court erred in failing to award her a one-half marital share of $72,871.20.

We review the findings of fact made by the family court under a clearly erroneous standard; we review application of law to the facts under an abuse of discretion standard. *See* Syllabus Point 1, *Carr v. Hancock*, *supra*. "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 231, 470 S.E.2d 177, 185 (1996) (citations omitted). "In general, an abuse of discretion occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed but the circuit court makes a serious mistake in weighing them." *Gentry v. Mangum*, 195 W.Va. 512, 520 n. 6, 466 S.E.2d 171, 179 n. 6 (1995).

2

West Virginia Code § 48-7-103 [2001] requires a family court to "presume that all marital property is to be divided equally between the parties[.]" West Virginia Code § 48-7-104 [2001] requires a family court to determine the value of the parties' marital property to be divided on either "the date of the separation of the parties" or "such later date determined by the court to be more appropriate for attaining an equitable result."

The family court established the value of the office building, and the loan on the office building, as of "the date of the separation of the parties[.]" W.Va. Code § 48-7-104. The evidence presented to the family court indicated a loan balance of $153,362.45 was due and owing on the date of the parties' separation in November 2008. On this record, there is no basis to say the family court's finding of fact was clearly erroneous.

Furthermore, we cannot say the family court abused its discretion when it declined to adopt the "later date" of August 2010 for valuing the loan rather than the November 2008 date of separation. At the hearings before the family court, Petitioner never argued to the family court whether or why it should adopt the August 2010 reduced loan value of $80,491.25. The Petitioner only presented the lower figure to the family court during cross-examination of the Respondent, and only by pointing to the $80,491.25 figure on an August 2010 computer printout from the bank and saying, "It's hidden up here." This was the same computer printout that showed the month-by-month balance of the loan, including its $153,362.45[1] balance at the time of separation in November 2008.

More importantly, the Petitioner introduced absolutely no evidence, and made absolutely no argument, to the family court why the loan value on that later date was "more appropriate for attaining an equitable result" in the distribution of marital assets. W.Va. Code § 48-7-104. The only formal mention of the August 2010 figure was in the Petitioner's proposed findings of fact to the family court, and it says only this: "As indicated by [Respondent-husband]'s Exhibit 15 . . . the amount owed on the mortgage on [the] building is ($80,491.25)." Petitioner can cite to no motions, no argument, no testimony and no evidence in the record before the family court to support the equitable argument she now asserts to this Court. Accordingly, we believe the family court properly set the value of the loan on the office building as of the date of the parties' separation, and the circuit court correctly affirmed the family court's decision on this point.

For the foregoing reasons, we affirm the February 20, 2013, order of the circuit court.

Affirmed.

---

[1] The family court found the debt was valued at $153,362.45. We note, however, that the document introduced into evidence shows a debt of $154,362.45 at the time of separation. The parties do not challenge this discrepancy, and we will accept the family court's figures as correct.

**ISSUED:** June 17, 2014

**CONCURRED IN BY:**

Justice Menis E. Ketchum
Justice Allen H. Loughry II
Judge David R. Janes, sitting by temporary assignment

**DISSENTING:**

Chief Justice Robin Jean Davis

**DISQUALIFIED:**

Justice Margaret L. Workman
Justice Brent D. Benjamin

4

Davis, Chief Justice, dissenting:

The case *sub judice* presents no novel issues regarding the equitable distribution of marital property. However, the majority opinion perpetuates the continuing cycle of errors committed by the lower courts by accepting the valuation of Mr. Johnstone's interest in the law firm of Johnstone, Gabhart, & Prim, LLP, proposed by Dr. Rufus, Mr. Johnstone's expert witness,[1] even though this valuation did not accurately value the subject law firm. Additionally, the majority opinion incorrectly affirmed the lower courts' findings that Mrs. Johnstone waived her interest to receive either one-half of the rental income paid by the law firm occupying the building owned by the parties or one-half of the increase in the equity of said building. It has been noted that, "[o]n appeal, if it appears that the trial court reasonably approximated the net value of the practice and its goodwill, if any, based on competent evidence and on a sound valuation method or methods, the valuation will not be disturbed." *Conway v. Conway*, 131 N.C. App. 609, 617, 508 S.E.2d 812, 818 (1998) (internal quotations and citation omitted). The case *sub judice* is not an example of the aforementioned scenario. Thus, for the reasons set out below, I respectfully dissent.

---

[1]Dr. Rufus valued the law firm at $149,200 as of the November 30, 2008, date of separation.

### A. Valuation of Law Firm

The majority opinion relies on the lower courts' incorrect reasoning and resultant conclusions that Mr. Selby, Mrs. Johnstone's expert witness, did not apply a "sound valuation method" in his calculation of the fair market value of the law firm, in accordance with this Court's decision in *May v. May*, 214 W. Va. 394, 589 S.E.2d 536 (2003). Further, in the underlying proceedings, the lower courts determined that Mr. Selby had collected incompatible data from different dates and reached the questionable conclusion that Dr. Rufus, Mr. Johnstone's expert witness, adhered to the *May* requirements and properly delineated data to reach reasonable valuation figures. Despite this contention, the majority opinion, as well as the lower courts' decisions, is devoid of any logical reasoning or explanation as to why Dr. Rufus's report provided the most accurate value of the law practice and Mr. Johnstone's interest therein. This "because I said so" reasoning does not indicate why Mr. Selby's report should not be adopted. In light of the evidence and to right this blatant wrongdoing by the lower courts, the majority opinion should have adopted Mr. Selby's report for the most reliable and accurate indicator of the law firm's fair market value for the following reasons.

First, Mr. Selby's report provides the most accurate figures as to the law firm's fair market value because his calculation accounts for Mr. Johnstone's 2004 purchase of Mr. Thaxton's one-half interest in the law firm for approximately $500,000. This transaction is

6

imperative to the fair market formula because it is the most recent and reliable indicator of the law firm's fair market value. *See* Syl. pt. 1, *Tankersley v. Tankersley*, 182 W. Va. 627, 390 S.E.2d 826 (1990) ("'The market value is the price at which a willing seller will sell and a willing buyer will buy any property, real or personal.' Syllabus Point 3, *Estate of Aul v. Haden*, 154 W. Va. 484, 177 S.E.2d 142 (1970)."). As such, Mr. Selby valued the law firm as of the 2004 acquisition at $1,000,000 and subtracted "post purchase events" to arrive at a fair market value of $707,000 as of the date of the parties' separation. However, based upon the majority opinion, it appears that the majority ignored this essential fact when they accepted Dr. Rufus's flawed fair market value figure.

Second, the majority opinion contends that Dr. Rufus followed the standards required by *May* and properly delineated data to reach a reasonable valuation.[2] However, the

---

[2]We recognized in *May v. May*, 214 W. Va. 394, 406, 589 S.E.2d 536, 548 (2003), five methods for valuing the "enterprise goodwill" of a professional practice, *i.e.*, a law firm, dental practice, accounting practice, or medical practice:

> [1] Under the straight capitalization accounting method the average net profits of the practitioner are determined and this figure is capitalized at a definite rate, as, for example, 20 percent. This result is considered to be the total value of the business including both tangible and intangible assets. To determine the value of goodwill the book value of the business' assets are subtracted from the total value figure.

> [2] The second accounting formula is the capitalization of excess earnings method. Under the pure capitalization of

(continued...)

7

evidence in this case contradicts this position because Dr. Rufus did not utilize any of the

five methods this Court provided in *May* for calculating the "enterprise goodwill" of a

---

[2](...continued)
excess earnings the average net income is determined. From this figure an annual salary of average employee practitioner with like experience is subtracted. The remaining amount is multiplied by a fixed capitalization rate to determine the goodwill.

[3] The IRS variation of capitalized excess earnings method takes the average net income of the business for the last 5 years and subtracts a reasonable rate of return based on the business' average net tangible assets. From this amount a comparable net salary is subtracted. Finally, this remaining amount is capitalized at a definite rate. The resulting amount is goodwill.

[4] The fourth method, the market value approach, sets a value on professional goodwill by establishing what fair price would be obtained in the current open market if the practice were to be sold. This method necessitates that a professional practice has been recently sold, is in the process of being sold or is the subject of a recent offer to purchase. Otherwise, the value may be manipulated by the professional spouse.

[5] The fifth valuation method, the buy/sell agreement method, values goodwill by reliance on a recent actual sale or an unexercised existing option or contractual formula set forth in a partnership agreement or corporate agreement. Since the professional spouse may have been influenced by many factors other than fair market value in negotiating the terms of the agreement, courts relying on this method should inquire into the presence of such factors, as well as the arm's length nature of the transaction.

(Internal quotations, citation, and footnotes omitted).

8

professional practice.[3]  This Court in *May* stated that enterprise goodwill, not personal goodwill, is an asset subject to equitable distribution in a divorce.[4]  Based upon the fact that Dr. Rufus's methods[5] for calculating the law firm's enterprise goodwill are not consistent with any of *May's* five expressed methods, the majority opinion's determination that Dr. Rufus followed the *May* requirements and generated *reasonable* valuation figures in accordance therewith is inaccurate and in direct opposition to the record evidence. Therefore, the majority opinion should have adopted Mr. Selby's fair market value of $707,000 because his enterprise goodwill formulas were consistent with those methods expressly approved of by this Court in *May*.

Third, in addition to embracing Dr. Rufus's incoherent and inconsistent "simple math" enterprise goodwill valuation methods, the majority has overlooked the fact

---

[3]"'Enterprise goodwill' is an asset of the business and may be attributed to a business by virtue of its existing arrangements with suppliers, customers, or others, and its anticipated future customer base due to factors attributable to the business."  Syl. pt. 2, *May v. May*, 214 W. Va. 394, 589 S.E.2d 536.

[4]"'Personal goodwill' is a personal asset that depends on the continued presence of a particular individual and may be attributed to the individual owner's personal skill, training or reputation."  Syl. pt. 3, *May v. May*, *id.*

[5]Mr. Johnstone's brief indicates that Dr. Rufus used both an asset and a market approach in his valuation.  According to Dr. Rufus, the asset approach (net asset value) sets a minimum/floor for determining total equity value and calculates the value of a business based on the difference between the business's fair market value and its assets and liabilities. Additionally, Dr. Rufus explained that the market approach derives an indication of value from a recent transaction within the subject entity or contractual formula set forth in a binding agreement.

that Dr. Rufus failed to consider the IRS factors approved by this Court in *Tankersley v.*

*Tankersley*[6] for valuing closely held corporations, specifically factor (d), the law firm's

earning capacity for a period of no less than five years.  Rather than considering these

---

[6]In *Tankersley v. Tankersley*, 182 W. Va. 627, 630 n.6, 390 S.E.2d 826, 829 n.6 (1990), this Court recognized that

> Revenue Ruling 59-60, 1959-1 C.B. 237, 238, sets forth eight factors which should be analyzed in valuing the stock of a closely held corporation for federal gift and estate taxes:
>
> (a) The nature of the business and the history of the enterprise from its inception.
>
> (b) The economic outlook in general and the condition and outlook of the specific industry in particular.
>
> (c) The book value of the stock and the financial condition of the business.
>
> (d) The earning capacity of the company.
>
> (e) The dividend-paying capacity.
>
> (f) Whether or not the enterprise has goodwill or other intangible value.
>
> (g) Sales of the stock and the size of the block of stock to be valued.
>
> (h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

factors, Dr. Rufus simply excluded nearly 40% of the law firm's historic annual revenue from the calculated value of the law firm. In actuality, the law firm's earning capacity is based upon contingent fee agreements, which should have been *included* in determining the value of the subject law firm, but which Dr. Rufus *excluded* from his valuation calculations.

W. Va. Code § 48-1-215(a) (2001) (Repl. Vol. 2009) defines "contingent fee agreement" as "a contract under which an attorney may be compensated for work in progress, dependent on the occurrence of some future event which is not certain and absolute. As such, a contingent fee agreement is *not an asset, but is potential income* or income capacity." (Emphasis added). Nevertheless, the remaining language of W. Va. Code § 48-1-215(a) recognizes that "[t]his potential income [contingent fee agreement] may have current value, and a portion of that current value, if any, may be considered to be a *marital asset*." (Emphasis added). Furthermore, the Legislature has listed several factors for a court to consider "[i]n the event a party seeks to quantify the current value of a particular contingent fee agreement for the purpose of establishing the value of the agreement as marital property . . . by a preponderance of the evidence." *Id.* These factors are:

> (1) The nature of the particular case or claim which underlies the agreement;
>
> (2) The jurisdiction or venue of any projected trial or proceeding;
>
> (3) Any historical data relevant to verdicts or settlements within the jurisdiction where the case or claim is pending or may

11

be brought;

> (4) The terms and particulars of the agreement;

> (5) The status of the case or claim at valuation date;

> (6) The amount of time spent working on the case or claim prior to the valuation date, and an analysis of the nature of how that time was spent, including, but not limited to, such activities such as investigation, research, discovery, trial or appellate practice;

> (7) The extent of the person's active role in the work in process, whether as an actual participant or as an indirect participant such as a partner, local counsel or other ancillary role;

> (8) The age of the case or claim;

> (9) The expenses accrued or projected to bring the case or claim to resolution, including any office overhead attributable to case or claim; and

> (10) The probable tax consequences attendant to a successful resolution of the case or claim.

W. Va. Code § 48-1-215(a). Despite this clear procedure for valuing contingent fee agreements, neither the majority opinion nor the lower courts' orders considered any of these factors when adopting Dr. Rufus's report, which excluded this marital asset from the law firm's value. Neither did the majority or the lower courts explain why they found such factors to be inapplicable to the case *sub judice*. Therefore, the majority should have adopted Mr. Selby's report because his calculations accurately valued the subject law firm and did not scrupulously omit income in an effort to generate an artificially low value thereof.

12

***B. Equitable Distribution of Parties' Interest in Rental Property Occupied by Law Firm***

In its analysis, the majority opinion additionally fails to address a crucial assignment of error raised in this appeal: whether Mrs. Johnstone waived her claim to one-half of the rental income generated by the parties' building that was rented to Mr. Johnstone's law firm. Although the record is clear that Mrs. Johnstone did not waive her interest therein, this vital piece of the equitable distribution puzzle was neither addressed by nor mentioned in passing in the majority opinion. It simply was omitted without any consideration whatsoever in the majority opinion's affirmance of the lower courts' decisions.

The record evidence demonstrates, without a doubt, that Mrs. Johnstone did not waive her claim to one-half of the rental income received by the parties' corporation, T&J, Partners, Inc. The family court hearing transcripts clearly demonstrate that the parties presented evidence and testimony regarding the rental income received and the manner in which it was used to reduce the indebtedness on the building, thus increasing the parties' equity therein. Nevertheless, the family court failed to include this asset in its equitable distribution of the parties' property. Although the family court awarded the building to Mr. Johnstone, subtracting the outstanding mortgage thereon, the family court did not account for the rental income that the parties received from the law firm or its application to reduce the building's outstanding mortgage. *See* W. Va. Code § 48-7-103 (2001) (Repl. Vol. 2009) ("In the absence of a valid agreement, the court shall presume that all marital property is to

be divided equally between the parties[.]").  As a result of this omission, Mr. Johnstone received an inequitable double-dip by both being awarded the building and being permitted to retain all of the rental income from the date of the parties' separation until the date of the family court's equitable distribution of the parties' property.  This is obviously not an equal division of the parties' marital property.

While the majority makes much of the family court's authority to select the magic date for valuing this marital asset, it fails to appreciate that both the corporation that owned this building and the rental income generated thereby were owned by *the parties*, and not by Mr. Johnstone, individually.  As such, Mrs. Johnstone was entitled to receive one-half of the increase in equity of this marital asset resulting from the application of the building's rental income to pay down its mortgage indebtedness.  Therefore, the majority opinion should have found the lower courts' decisions to be in error because this issue clearly was not waived, was properly raised, and should have been resolved in the instant appeal to this Court.

Based upon the above reasoning, I respectfully dissent.